625 A.2d 984

**Maurice Edward FORD**

v.

**STATE of Maryland.**

**No. 59, Sept. Term, 1992.**

Court of Appeals of Maryland.

June 10, 1993.

John L. Kopolow, Asst. Public Defender (Stephen E. Harris, Public Defender, both on brief), Baltimore, for petitioner.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

CHASANOW, Judge.

In the early morning hours of May 27, 1990, petitioner, Maurice Edward Ford, and three other youths stood on or next to the Capital Beltway and hurled large landscaping rocks at vehicles travelling on the Beltway. A number of people in the vehicles were injured and significant damage was done to many vehicles. Ford was apprehended on June 2, 1990, and a ninety count indictment ultimately charged him with assault with intent to murder (eight counts), assault with intent to maim (one count), assault with intent to disable (twenty-eight counts), assault and battery (twenty-nine counts), and malicious destruction of property (twenty-four counts). A Prince George's County Circuit Court jury found Ford guilty of one count of assault with intent to maim, eleven counts of assault with intent to disable, seventeen counts of assault and battery, six counts of assault, fourteen counts of malicious destruction of property which the jury found to have value of $300 or more, and three counts of malicious destruction of property of value less than $300. The circuit court, Missouri, J., imposed sentences totalling thirty-nine years with additional prison terms suspended in favor of five years probation to commence upon Ford's release.

Ford appealed to the Court of Special Appeals, which reversed and remanded for resentencing on two of the malicious destruction of property counts worth less than

$300, but otherwise affirmed all of the convictions.[1] *Ford v. State*, 90 Md.App. 673, 603 A.2d 883 (1992). Upon his petition to this Court, we granted certiorari to consider issues relating to his remaining convictions. We find no error and affirm Ford's convictions.

## I. *Facts*

We adopt the facts as set forth in the opinion of the Court of Special Appeals:

"In the early morning hours between 2:00 and 3:00 a.m. of May 27, 1990, John Burgess, Donnell Petite, and Ford threw rocks at a number of vehicles driving south on the Capital Beltway and at least one vehicle which was traveling north on the Beltway. Most of the vehicles that were hit pulled over to the side of the road. Witnesses estimated that anywhere from 15 to 40 vehicles were struck and then stopped. Patricia Jones's car was the first to stop and Jones estimated that the rock throwing continued from 30 to 45 minutes after she stopped.

"Ford confessed to being one of the rock throwers. He admitted that he and the others gathered rocks from underneath a bridge and then brought the rocks to the Beltway; other rocks were found on the side of the road. After throwing the rocks, the youths retrieved some of them from the Beltway so they could throw them again. Ford admitted that about 15 cars were struck. His explanation for his actions was that he was drunk; he maintained that he and his cohorts were not trying to hurt anyone.

"After the rock throwing incident, 15 to 20 large rocks were observed in the southbound lanes and five to 10 rocks on the northbound side. The rocks had been used

---

**1.** The trial judge apparently treated two counts on which the jury had found Ford guilty of malicious destruction of property under $300 as if it had found Ford guilty of malicious destruction of property of $300 or more. The Court of Special Appeals remanded for resentencing on these counts.

to landscape the underpass of the Beltway at Livingston Road.

"Several witnesses stated that the rock throwers worked in concert. Byron Jeffrey's car was hit by two rocks. After passing the rock throwers, he observed in his rearview mirror three figures who continued to throw rocks. Gregory Roddy observed three men waving their arms; he slowed down and one threw a rock, hitting his windshield. Blease Garner observed three men walking south. He observed one man throw a rock at another car. As Garner's car approached, another turned around and threw a rock at Garner's car. Garner stopped, got out of his car, and gave chase. The three men "started laughing" and ran into the woods.

"Others saw only one man. For example, Robert Tillery was driving south when he saw a black male enter the highway from the median strip. Believing that the man was attempting to cross the road, Tillery changed lanes. Tillery related that the man took two steps and then threw a rock through his windshield. Jeanette George observed someone flagging her down. As she slowed, the man threw a rock through the windshield of her car.

"The episode resulted in many personal injuries and extensive property damage. The most severely injured person was Destiny Morris, whose skull was fractured when she was struck in the head by a rock. The surgeon who tended to Morris shortly after the incident testified that Morris would have died if she had not received immediate medical attention. As a result of her injuries, Morris is expected to function permanently on a third or fourth grade level. Morris was riding in James Palmer's truck when three men stepped onto the side of the highway and each threw a rock. All three rocks went through the windshield. One struck Morris in the head. John Miller, another passenger in Palmer's truck, received scratches from the breaking glass. The fourth

passenger, Leanne Ekberg, received "little scrapes." Palmer's truck suffered damages totaling $4,000.

"At trial, the witnesses testified to the results of the rock throwing incident. The windshield of Robert Tillery's car was broken, causing $500 [in] damages. Elmer Moody's car, driven by Gloria Scott, also received a broken windshield. Kelley Moody, who was a passenger in the car, suffered a broken jaw and lost the hearing in her right ear.

"Byron Jeffrey's car window was broken by a rock that hit passenger LaShonda Thompson, breaking her arm in three places. Damage to Jeffrey's car totaled $1,300. Jeffrey Baker's van was dented by a thrown rock, causing $680 in damages. The windshield of Julee Robinson's car was hit by a rock, resulting in damages amounting to $400.

"Jeanette George was driving Rodney Marbury's car, which sustained a broken windshield and damages totaling from $1,200 to $1,400. Glass entered George's eye and cut her hand. Marbury was hit by a rock and lost consciousness. He was blinded in his right eye and suffered a broken wrist.

"Nora Quintana received scratches on her face and hands when the windshield in David Powell's car exploded. Powell's shoulder was injured. Powell was unable to provide the total amount of damage to his car as the repairs were paid for by the insurance company, with the exception of a $500 deductible. Carolyn Smith Bryant received cuts on her hands and face and glass in her mouth when a rock hit a window of her car. Damages to Bryant's vehicle totaled over $1,000. Esther Humphrey's car, which sustained $1,100 in damages, was also hit by a rock. Michelle Bazilio, a passenger in Humphrey's car, had her hand cut by flying glass.

"The windshield of Steve Harrison's car, driven by his sister Amanda, was broken. Damages to the car totaled $125. Robert Brannigan's car was hit in the left rear passenger window. Tonia Wilkins's car also received a

large dent on the left rear side, causing $338 total damages. Blease Garner's car was struck on the top of the roof, causing the windshield to shatter, resulting in $835 of damages. Gregory Roddy's car was struck in the windshield, causing $3,200 in damages. Robert Senkel's van was hit in the windshield by a rock, resulting in damages of $1,600. Frank Bailey's car, driven by his son Reginald, had a broken windshield. Reginald's forehead was cut and glass blew into his mouth. The left rear wheel of Kim Buchant's car was struck, causing $730 in damages. Jose Torres's car was hit on the driver's door, causing between $200 and $400 in damages." (Footnote omitted).

*Ford,* 90 Md.App. at 677–80, 603 A.2d at 885–86.

Ford makes four principle assertions of error regarding his convictions. We address each in turn.

## II. *Malicious Destruction of Property*

■ For the damage his rock-throwing caused to various vehicles, Ford was charged with twenty-four counts of "malicious destruction of an automobile" under Maryland Code (1957, 1992 Repl.Vol.), Article 27, § 111.[2] Section 111 divides the crime of malicious destruction of property into two degrees of misdemeanor. At the time Ford was charged, the statute provided that the malicious destruction of property valued at less than $300 carried a penalty of up to a $500 fine or 60 days imprisonment or both; malicious destruction of property valued at $300 or greater carried a penalty of up to a $2,500 fine or three years imprisonment or both.[3] Ford's indictment did not specifically allege value on any of the twenty-four counts.

---

**2.** Unless otherwise noted, all references to section numbers herein are to Maryland Code (1957, 1992 Repl.Vol.), Article 27.

**3.** Section 111 was amended effective October 1, 1992 only to clarify that "value" refers to the amount of the damage, not the total value of the damaged property. *See* Chapter 535 of the Acts of 1992. As amended, § 111 provides:

Ford contends that, by failing to specifically allege value of $300 or greater, the indictment charged only the lesser degree of the crime. Therefore, he contends that even though he did not object to submission of the greater crime to the jury, he could not be found guilty of fourteen counts of that greater crime. Ford relies on *dictum* in *Spratt v. State*, 315 Md. 680, 556 A.2d 667 (1989), in which we said that "if the State wishes to pursue the more serious offense, it must specifically charge and prove the value of the destroyed property, [$300 or greater]." *Id.* at 686, 556 A.2d at 669–70. This was *dictum* in *Spratt* because the defendant there *was* properly charged with the greater offense; rather, the issue in *Spratt* was the court's failure to instruct the jury that it must specifically find that the defendant destroyed property of $300 or more in value to convict on that charge. Nonetheless, we think *Spratt* correctly stated the law with respect to charging as well.

An apt analogy can be found in our construction of the consolidated theft statute, § 342. Section 342(f) divides theft into the felony of theft of $300 or more and the lesser included misdemeanor of theft under $300. In *Hagans v. State*, 316 Md. 429, 441, 559 A.2d 792, 798–99 (1989), we considered whether the value of the stolen property was an element of the theft offenses or simply a factor to be considered for sentencing purposes. We held that valuation is an element of theft that the State must set forth in the

---

"(a) *Violation constitutes misdemeanor.*—Any person who shall wilfully and maliciously destroy, injure, deface or molest any real or personal property of another shall be deemed guilty of a misdemeanor.

(b) *Penalty where amount of damage is less than $300.*—If the amount of damage to property defaced, destroyed, injured, or molested has a value of less than $300, the person who violates this section, on conviction, is subject to a fine not exceeding $500 or imprisonment not exceeding 60 days or both.

(c) *Penalty where amount of damage is greater than $300.*—If the amount of damage to property defaced, destroyed, injured, or molested has a value of $300 or more, the person who violates this section, on conviction, is subject to a fine not exceeding $2,500 or imprisonment not exceeding 3 years or both."
Md.Code (1957, 1992 Repl.Vol., 1992 Supp.), Art. 27, § 111.

charging document. We placed great emphasis on valuation in part because "[o]ne should know, long before the imposition of sentence, whether he has been charged with a felony or a misdemeanor." *Id.,* 559 A.2d at 798. Although the lesser and greater offenses of malicious destruction at issue in the instant case are both misdemeanors, the maximum sentences differ considerably. The maximum sentence for the lesser offense is 60 days, while the maximum for the greater offense is three years. For the same reasons set forth in *Hagans* with respect to theft, one should know, long before the imposition of sentence for malicious destruction of property, with what degree of the crime he or she has been charged.

The State initially argues that the charging document was not defective. It contends that, upon his indictment for destruction of an "automobile," Ford should have known he was being charged with the greater offense since "automobiles generally cost more than $300." We disagree, as we do not believe that the correctness of the charging document can turn on what a defendant should or might know about the value of property.[4] The State also argues that if failure to include value in the indictment did make the charging document defective, Ford waived this defect by not objecting to it before trial, or when it became apparent during trial. Maryland Rule 4-252(a)(2) provides that a defect in the charging document other than its failure to show jurisdiction in the court or to charge an offense is waived if not raised in the circuit court.

First, we agree with Ford that the indictment did not properly charge malicious destruction in the amount of $300 or greater. As we have said:

---

4. We also note that, as the 1992 revision to § 111 makes clear, *see supra* n. 3, the "value" is the amount of the destruction, not the total value of the property. Thus, the value of an entire automobile is irrelevant to the charge unless, of course, the entire vehicle is destroyed.

"A primary purpose to be fulfilled by a charging document under Maryland law is to satisfy the constitutional requirement of Article 21 of the Declaration of Rights that each person charged with a crime be informed of the accusation against him, first, by characterizing the crime and, second, by so describing it as to inform the accused of the specific conduct with which he is charged."

*Jones v. State,* 303 Md. 323, 336, 493 A.2d 1062, 1069 (1985) (citations omitted). It is not too burdensome to require that the State properly charge the crime for which it seeks to convict the defendant. As we noted in *Spratt,* 315 Md. at 683, 556 A.2d at 668, the General Assembly intended that the crime of malicious destruction of property be treated as a single misdemeanor offense with two different classifications. Where the State intends to seek a sentence for the greater offense, it should include a value of $300 or greater in the indictment.[5]

Acknowledging a defect in the charging document does not resolve the issue, however. We must now ask whether the failure to charge value is the type of defect that Ford can raise on appeal having not raised it at trial. In general, Md. Rule 4–252(a)(2) requires that a party raise any objections related to defects in the charging document at trial, or else waive the objections. An exception to this general rule is where the charging document fails "to show jurisdiction in the court or to charge an offense." Md. Rule 4–252(c). A party may raise such defects at any time. *Id.* Thus, the issue here is whether the defect in Ford's charging document was jurisdictional in nature. Previously, we have said that not all of an offense's essential elements need be set forth in the charging document. *Campbell v. State,* 325 Md. 488, 495, 601 A.2d 667, 671 (1992). A

---

**5.** If the State alleges the greater amount and then fails to prove it at trial, the factfinder can still convict of the offense of malicious destruction of property amounting to less than $300, which is a lesser-included offense of the greater crime.

document that contains "words that sufficiently character-ize the crime will satisfy the jurisdictional requirement." *Williams v. State*, 302 Md. 787, 793, 490 A.2d 1277, 1280 (1985). Although Ford's charging document did not allege the element of value of $300 or greater, it sufficiently characterized the misdemeanor of malicious destruction of property to establish the jurisdiction of the court and to charge an offense. As we held in *Campbell*, 325 Md. at 501–03, 601 A.2d at 673–74, omission from the charging document of an element which serves to aid a defendant in determining the maximum possible penalty was not a juris-dictional defect, and could be waived if no objection is made at trial.

At issue in *Campbell* was the sufficiency of the indict-ment charging the defendant with conspiracy to violate Maryland's controlled dangerous substances law. The in-dictment did not allege the object of the conspiracy, posses-sion with intent to distribute cocaine. Campbell claimed that before he could be sentenced for conspiracy to violate Maryland's controlled dangerous substance law, he must have been charged with enough specificity to inform him of the identity of the controlled dangerous substance and how it was to be used. Otherwise, Campbell alleged, the indict-ment would be jurisdictionally defective for failing to give him notice of the charge or permit his determination of the applicable penalty, which was dependent on the punishment for the underlying offense. *See* § 38 (punishment for con-spiracy "shall not exceed the maximum punishment provid-ed for the offense [defendant] conspired to commit"). We noted that while the indictment might well have been defec-tive, the defect was not jurisdictional because the indict-ment sufficiently characterized the crime of conspiracy. *Campbell*, 325 Md. at 501, 601 A.2d at 673. Campbell had never moved to dismiss the conspiracy count as defective, nor had he requested a bill of particulars. From this, as well as from the counts of the indictment, we held it could be inferred that the indictment adequately informed him of the charges he faced. Moreover, the judge's conspiracy

instruction properly included the specific object of the conspiracy, and he never objected to these instructions. Based on these facts, we affirmed Campbell's conviction.

In the instant case, both the jury instructions and the verdict sheet specifically included a value greater than $300. If the defendant believed that the charging document alleged *only* a value of less than $300, he should have objected to the jury instructions. Md. Rule 4–325(e). Ford never contended at trial that the charging document, by not stating value, had charged only malicious destruction under $300. There was ample opportunity to raise this objection when the judge gave the jury instructions on degrees of malicious destruction, when the verdict sheet was prepared for submission, or at any time before the jury retired to consider the evidence. Ford never raised any objection on this issue below and acquiesced in the instructions and verdict sheet. By not objecting when the circuit court construed the indictment to cover both degrees of the misdemeanor and by failing to object after the court instructed the jury, Ford waived the issue and did not preserve it for appellate review. *Johnson v. State,* 310 Md. 681, 684–89, 531 A.2d 675, 676–79 (1987); *Campbell,* 325 Md. at 501–03, 601 A.2d at 673–74.

### III. *Assault and Battery*

Ford next contends that his convictions for assault and battery of James Palmer, Norma Bennett, Robert Tillery, and Nathan Bryant should be reversed. He claims these four convictions cannot stand because there was no evidence in the record to support a finding that the four alleged victims saw or felt anything touch their bodies or clothes. Without such an offensive touching, Ford contends, the jury could not find a battery. Even were we to agree that the record does not support a finding of battery on these four counts, we note that Ford was charged in each instance not merely with battery, but with *assault and battery,* and we find there was sufficient evidence to sup-

port at least a conviction for assault on each of the challenged counts.

■ Assault and battery are two closely related but distinct crimes. *See State v. Duckett*, 306 Md. 503, 510, 510 A.2d 253, 256 (1986) ("there is no single crime in our State called 'assault and battery' "); *Woods v. State*, 14 Md.App. 627, 631–32, 288 A.2d 215, 218 (1972). As Ford correctly indicates, a battery includes a harmful or offensive touching. *See Duckett*, 306 Md. at 510, 510 A.2d at 256 (" '*any* unlawful force used against the person of another, *no matter how slight* will constitute a battery,' " quoting *Kellum v. State*, 223 Md. 80, 85, 162 A.2d 473, 476 (1959) (emphasis in original)). An assault by its very nature, however, occurs without any touching at all. Maryland recognizes two forms of assault: " '(1) an attempt to commit a battery or (2) an intentional placing of another in apprehension of receiving an immediate battery.' " *Snowden v. State*, 321 Md. 612, 617, 583 A.2d 1056, 1059 (1991) (quoting *Dixon v. State*, 302 Md. 447, 457, 488 A.2d 962, 966 (1985), quoting R. Perkins, *Criminal Law* 114 (2d ed. 1969)).[6]

■ If assault and battery are two separate crimes, a charge of "assault and battery" might seem to run afoul of the general rule that an indictment charging the commission of two or more substantive offenses in the same count is objectionable as duplicitous. *See, e.g., Kirsner v. State*, 183 Md. 1, 5, 36 A.2d 538, 540 (1944); *Jackson v. State*, 176 Md. 399, 401, 5 A.2d 282, 283 (1939). This common law rule is implicit in the Maryland Rules of Procedure, which provide that "[t]wo or more offenses ... may be charged in *separate counts* of the same charging document...." Md. Rule 4–203(a) (emphasis added). Rule 4–203(a) has been

---

**6.** In some contexts, the word "assault" has still a third meaning. When part of a statutorily defined crime, assault can also encompass a completed battery. The crimes of assault with intent to murder or assault with intent to maim, for example, may include, but do not require, actual battery.

construed by the Court of Special Appeals as mandatory, requiring that two offenses may be charged *only* in separate counts. *Ayre v. State,* 21 Md.App. 61, 65, 318 A.2d 828, 831 (1974) (Orth, C.J.). The crimes of assault and battery, however, constitute a generally recognized common law exception to the rule against duplicitous charges. They are often charged in one count. *Snowden, supra; Ireland v. State,* 310 Md. 328, 529 A.2d 365 (1987); *Gerald v. State,* 299 Md. 138, 472 A.2d 977 (1984); *see also Ayre,* 21 Md.App. at 65 n. 9, 318 A.2d at 891 n. 9 (assault and battery are "invariably charged in one count"); *Cain v. State,* 34 Md. App. 446, 452, 367 A.2d 47, 51, *cert. denied,* 280 Md. 728 (1977). We also note that this practice is long-standing. *See Manly v. State,* 7 Md. 135 (1854). Although assault and battery have historically been permitted to be charged together, there remains a substantive distinction between the two crimes. *See generally* R. Perkins, *Criminal Law* 79–96 (2d ed. 1969); Clark & Marshall, *A Treatise On The Law of Crimes* §§ 10.15 to 10.20 (7th ed. 1967); L. Hochheimer, *A Manual of American Criminal Law* §§ 27–28 (1911).

Because assault and battery are distinct crimes, when they are charged in the same count a defendant has the option of requesting separate determination of assault and battery, although there can be only one sentencing for the assault and battery count. One possible verdict is guilty of battery. As long as the battery was intentional, the battery conviction necessarily includes an assault, because an attempted-battery type of assault is included in the completed battery. Another possible verdict is guilty of assault alone. Upon failing to find the harmful or offensive touching necessary for a battery, the facts may nonetheless support, and the factfinder may find, either type of assault: (1) an attempt to batter, or (2) the creation of an apprehension of an imminent battery. Thus, "on an indictment for assault and battery one may be convicted of assault only." Clark & Marshall, *A Treatise On The Law of Crimes* § 10.19, at 733 (7th ed. 1967) (citing 1 Hawkins, *Pleas of the*

*Crown* c. 15, § 2); *see also Gerald, supra* (appellant charged with assault and battery and convicted only of assault).

 In this case, Ford was charged with twenty-nine counts of assault and battery. For the four counts with which Ford takes issue, the victims were James Palmer, Norma Bennett, Nathan Bryant, and Robert Tillery, and there was sufficient evidence to support assault convictions. In each case, the assailants threw a rock into the victims' vehicle, shattering the windshield. James Palmer and Norma Bennett were travelling in the same vehicle as Destiny Morris, who was struck in the head by a rock and severely injured. Other occupants of the Palmer vehicle were covered with glass. Nathan Bryant's wife, riding next to Bryant, was covered with flying glass when the rock shattered the windshield. The rock that shattered the windshield of Robert Tillery's car entered just to the right of the steering wheel as he swerved to avoid the projectile, and barely escaped injury. This evidence supports assault convictions as to the four victims. The jury could easily have found that the assailants attempted to commit batteries upon the vehicles' occupants, or at least that they intended to create the apprehension of an imminent battery. The indictment properly charged Ford with assault, and so we affirm these convictions.

## IV. *Assault With Intent to Disable*

Under § 386, it is a felony to "assault or beat any person, with intent to maim, disfigure or disable such person...." [7]

---

**7.** At the time Ford was charged, Article 27, § 386 provided, in full:

**§ 386. Unlawful shooting, stabbing, assaulting, etc., with intent to maim, disfigure or disable or to prevent lawful apprehension.**

"If any person shall unlawfully shoot at any person, or shall in any manner unlawfully and maliciously attempt to discharge any kind of loaded arms at any person, or shall unlawfully and maliciously stab, cut or wound any person, or shall assault or beat any person, with intent to maim, disfigure or disable such person, or with intent to prevent the lawful apprehension or detainer of any

The jury found that Ford assaulted seven drivers and four passengers with the intent to disable them.[8] Ford argues that there was insufficient evidence to support these convictions.

### A.

A proper conviction under § 386 requires a specific intent to permanently maim, disfigure, or disable the victim. *Hammond v. State*, 322 Md. 451, 457–59, 588 A.2d 345, 347–48 (1991). A specific intent crime requires that the defendant, upon doing the act, have " 'some intent other than to do the *actus reus* thereof....' " *McBurney v. State*, 280 Md. 21, 29, 371 A.2d 129, 133 (1977) (quoting R. Perkins, *Criminal Law* 762 (2d ed. 1969)). The defendant must have "the additional deliberate and conscious purpose or design of accomplishing a very specific and more remote result." *Shell v. State*, 307 Md. 46, 63, 512 A.2d 358, 366 (1986) (quoting *Smith v. State*, 41 Md.App. 277, 305, 398 A.2d 426, 443, *cert. denied*, 284 Md. 748 (1979)). For a conviction of assault with intent to disable under § 386, therefore, the State must prove not only that Ford committed an assault, but that he did so with the specific intent to disable. Ford contends there is insufficient proof of such intent. We disagree.

We begin by noting that in finding specific intent "the jury is permitted to draw such inferences of intent as are

party for any offense for which the said party may be legally apprehended or detained, every such offender, and every person counselling, aiding or abetting such offender shall be guilty of a felony and, upon conviction thereof, be punished by confinement in the penitentiary for a period not less than eighteen months nor more than ten years."
Md.Code (1957, 1987 Repl.Vol.), Art. 27, § 386. A 1991 amendment removed the minimum term of punishment and increased the maximum term to fifteen years. Chapter 234 of the Acts of 1991 (codified at Md.Code (1957, 1992 Repl.Vol.), Art. 27, § 386).

**8.** The jury also found that Ford assaulted with intent to maim one of the four passengers, Destiny Morris, but this conviction was merged with his conviction of assault with intent to disable Morris.

warranted under all the circumstances of the particular case...." R. Perkins & R. Boyce, *Criminal Law* 854 (3d ed. 1982) (footnotes omitted) (hereinafter Perkins & Boyce). Ford himself admits that this Court has often permitted the requisite specific intent to be inferred from the surrounding circumstances. As we explained with respect to intent to murder in *Davis v. State*, 204 Md. 44, 51, 102 A.2d 816, 819 (1954), "[s]ince intent is subjective and, without the cooperation of the accused, cannot be directly and objectively proven, its presence must be shown by established facts which permit a proper inference of its existence." We have repeatedly permitted such inferences. Most recently, in *State v. Raines*, 326 Md. 582, 606 A.2d 265, *cert. denied*, —— U.S. ——, 113 S.Ct. 390, 121 L.Ed.2d 299 (1992), we upheld a murder conviction, finding the requisite intent to kill when the evidence showed the defendant aimed and fired a pistol at an occupied vehicle's driver-side window. *Id.* at 591, 606 A.2d at 269; *see also Taylor v. State*, 238 Md. 424, 433, 209 A.2d 595, 600 (1965) ("An intent to murder may, under proper circumstances, be inferred by the use of a deadly weapon directed at a vital part of the human body...."); *Oakley v. State*, 238 Md. 48, 53, 207 A.2d 472 (1965), *cert. denied*, 384 U.S. 1021, 86 S.Ct. 1927, 16 L.Ed.2d 1022 (1966) (defendants "cut [the victim] in and about vital parts of his body.... These facts were sufficient to justify a permissible inference of an intent to kill...."); *Ferrell v. State*, 234 Md. 355, 356, 199 A.2d 362 (1964) ("The character of the assault, coupled with the use of a deadly weapon directed at a vital part of the victim's body and the threat to kill, justified the jury in finding an intent to murder...."); *Bird v. State*, 231 Md. 432, 436, 190 A.2d 804 (1963) ("the appellant admitted the assault and the intent to kill was inferable from the use of a deadly weapon directed toward a vital part of the body.").

This Court and the Court of Special Appeals have also held that the intent necessary for a conviction under § 386 may be inferred from evidence of an attack with a deadly weapon. *Marks v. State*, 230 Md. 108, 112–13, 185 A.2d

909, 912 (1962), *cert. denied,* 373 U.S. 918, 83 S.Ct. 1308, 10 L.Ed.2d 417 (1963) (putting lit match to victim's shirt sufficient to establish assault with intent to maim); *Robinson v. State,* 66 Md.App. 246, 248–50, 503 A.2d 725, 726–27, *cert. denied,* 306 Md. 289, 508 A.2d 489 (1986) (shooting in thigh coupled with threats prior to the shooting were sufficient to establish assault with intent to disable).

We need not evaluate the relative strength of the inference that Ford threw the rocks with intent to disable. When reviewing the sufficiency of the evidence to support a criminal conviction, the test is simply "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979) (emphasis in original); *Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830, 842 (1980). A rational jury could have found that, when Ford threw rocks at the windshields of vehicles travelling at highway speed, he intended to permanently disable any and all occupants of the vehicles. It is permissible to infer that "one intends the natural and probable consequences of his act." *Davis,* 204 Md. at 51, 102 A.2d at 819–20 (citations omitted). It is a reasonable inference that a "natural and probable consequence" of throwing a large rock through the windshield of a fast moving vehicle is permanent injury of various forms to the vehicle's occupants. Occupants might be directly struck with a rock, as were Destiny Morris and LaShonda Thompson, or badly cut by the shattering windshield, as were Jeanette George and Nora Quintana. Occupants might also be injured when the driver, disabled or rendered unconscious by a rock, runs into another vehicle, a guardrail, or an overpass. These and other potential injuries are both natural and probable consequences of hurling a large rock through the windshield of a fast moving vehicle. Therefore, the evidence sufficiently supported the jury's

conclusion that Ford intended to disable as required by § 386.[9]

### B.

 Perhaps anticipating that a jury might be permitted to infer the requisite criminal intent, Ford attempts to limit his liability by arguing that the only possible inference that could be drawn from his actions was an intent to disable the vehicles' drivers. Conceding for this argument an intent to disable the drivers, Ford nonetheless reasons that while every vehicle must have a driver, not every vehicle must have passengers. Because Ford believes there was insufficient evidence to support a finding that he knew there were passengers in the vehicles, he contends it was impossible for him to have intended to maim or disable individuals whom he did not know were present.

We believe, however, that the Court of Special Appeals correctly concluded, upon a review of the record, that the jury could have found Ford was aware of the presence of at least the four passengers whom it found were victims of assault with intent to disable: Rodney Marbury, LaShonda Thompson, Kelly Moody, and Destiny Morris. In these four instances, a number of factors would support the jury's rational inference that Ford knew passengers were present.

Rodney Marbury was a passenger in a car driven by Jeanette George. He testified that, as the car approached the overpass, he noticed a number of cars stopped on both sides of the road. He saw someone step out into the road,

---

**9.** In his brief, Ford argues that because twenty-three cars were targeted and only one victim, Destiny Morris, was "permanently injured," it cannot be said that permanent injury is a "natural and probable" result of Ford's actions. It is irrelevant whether, viewed after the fact, only one victim sustained permanent injuries. The question is whether the jury could have found that Ford intended to cause permanent injury, without regard to whether such injury was in fact suffered. That more permanent injuries were not sustained is perhaps attributable to Ford's bad aim or the victims' good fortune, but is not dispositive of Ford's intent.

waving his hand at the car as if trying to get the car to slow down. Marbury was then hit with a brick, from which attack he suffered a broken wrist and lost the sight in his right eye. Ms. George was able to describe the color of the assailant's clothing, and testify that he was short with a slim build. As the car had slowed down and was close enough to the assailant to sufficiently allow Marbury and George to make these observations, the jury could have made a rational inference that Ford was close enough to see that a passenger was in the car.

LaShonda Thompson was a passenger in a car driven by Byron Jeffrey. She testified that the person who threw the rock waited until the car was close enough to hit and that the rock was thrown at the passenger side of the vehicle. Thompson's arm was broken in three places. As with Rodney Marbury, the jury could have inferred from the testimony about the relative positions of the car and the assailant that the assailant knew there was a passenger in the car when he threw the rock.

Kelly Moody was a passenger in a car driven by Gloria Scott. Although neither Moody nor Scott could relate any of the details surrounding the rock-throwing that fractured Moody's jaw, causing her to have heart problems and to lose the hearing in her right ear, other testimony that the assailants stepped out onto the highway and slowed cars down before hurling the rocks could sufficiently support the jury's inference that the assailants could see a passenger in the Scott car.

Finally, Destiny Morris was a passenger in a pickup truck driven by James Palmer. Palmer testified that he saw three individuals step onto the roadway and throw rocks at vehicles on the road. He was able to describe the color of the clothing worn by each individual and their movements along the shoulder and onto the road. He stated that he was about 25 feet from the individuals when he saw them move onto the side of the highway. This testimony sup-

ports the jury's inference that the assailants could see the passengers in his truck.

Further bolstering the jury's ability to conclude that the assailants could see the vehicles' passengers is testimony that the vehicles were travelling down the highway in groups of two to ten vehicles. From this testimony, the jury could have inferred that there was enough backlight and reflected light in the area to sufficiently illuminate the interiors of the vehicles. Finally, the evidence supported a finding that there was an intent to disable any passengers in the vehicle. James Palmer's testimony that he saw each of three individuals throw a rock at his truck supports an inference that the assailants were attempting to disable as many people in the vehicles as possible, including drivers as well as any and all passengers. Thus, we believe the jury could have found that the assailants, Ford included, intended to disable the vehicles' passengers.

Ford's final attempt to escape culpability under § 386 is his contention that even if the trier of fact concludes that he was aware of other persons in the car, he was then merely hurling a rock at a group of people. According to Ford, this reflects only a "generalized malevolence" and not a specific intent directed to a specific victim. Ford's argument fails to consider the distinct possibility that if Ford threw a rock that could potentially disable all of a car's occupants, it could be inferred that he intended to disable each and every person inside. By hurling large rocks through the windshields of fast-moving vehicles, Ford created a zone of extreme peril inside the vehicles. Within this zone, many or all occupants of the vehicles would likely be harmed, whether by the rock, the flying glass, or the drivers' losing control of the vehicle. Under these circumstances, one act, the throwing of a single rock, could foreseeably cause multiple injuries. Where his actions were such that a single act could be expected to cause harm to all the vehicles' occupants, the jury reasonably concluded that Ford had the specific intent to disable all the vehicles'

occupants, not just a "generalized malevolence." A defendant can be convicted of multiple specific intent crimes from one act when it can be inferred that he intended to cause harm to more than one victim. *See Hall v. State*, 69 Md.App. 37, 50, 516 A.2d 204, 210–11 (1986), *cert. denied*, 308 Md. 382, 519 A.2d 1283 (1987) (Karwacki, J.) (three convictions under § 386, assault with intent to prevent lawful apprehension, upheld where appellant fired shots at pursuing officers); *Jackson v. State*, 63 Md.App. 149, 157–59, 492 A.2d 346, 350–51 (1985), *rev'd on other grounds sub nom. Cherry v. State*, 305 Md. 631, 506 A.2d 228 (1986) (two convictions for assault with intent to murder upheld when appellant fired one shotgun blast at moving police car containing two officers). Because of the potential for multiple injuries from Ford's acts, the jury could properly have inferred an intent to disable all the occupants of the vehicles, not just a "generalized malevolence" as Ford contends.

In sum, based on the foregoing discussion, we believe the jury could have found that Ford assaulted with intent to disable both the drivers and the passengers in the counts on which he was convicted, and we affirm his convictions on these counts.

## C.

We now address an important, albeit somewhat collateral, issue that the Court of Special Appeals addressed in the instant case. At trial, the judge also instructed the jury on the common law doctrine of transferred intent that this Court approved in *Gladden v. State*, 273 Md. 383, 330 A.2d 176 (1974). The theory of transferred intent as explicated in *Gladden* is that " 'the state of mind which one has when about to commit a crime upon one person is considered by law to exist and to be equally applicable although the intended act affects another person.' " *Id.* at 404, 330 A.2d at 188 (quoting W. Ritz, *Felony Murder, Transferred Intent, and the Palsgraf Doctrine in Criminal Law*, 16 Wash. & Lee L.Rev. 169–71 (1959)). The judge instructed the jury that if it found Ford assaulted with intent to

disable the drivers, this intent could be transferred to the passengers. Ford never objected to this instruction and, in light of our conclusion above that the evidence sufficiently supported a jury determination that Ford intended to disable both drivers and passengers in the vehicles, we decline to find the unobjected to instruction was reversible error under the plain error doctrine. *See Bruce v. State,* 328 Md. 594, 611, 616 A.2d 392, 400 (1992); *Rubin v. State,* 325 Md. 552, 588, 602 A.2d 677, 694 (1992). Nonetheless, the Court of Special Appeals addressed at some length the issue of transferred intent. Because of the need to clarify the inapplicability of transferred intent to assault with intent to disable and related crimes, we believe it is necessary to comment upon the intermediate appellate court's discussion. The Court of Special Appeals held that the doctrine of transferred intent did not apply to the crimes with which Ford was charged. For two reasons, we believe the Court of Special Appeals was correct that transferred intent does not apply to § 386 offenses. We acknowledge that one of these reasons may be inconsistent with prior indications by this Court that transferred intent applies to attempted murder and assault with intent to murder.

Although it is clear that the doctrine of transferred intent applies to both general and specific intent crimes, the Court of Special Appeals correctly perceived that there are two types of specific intent crimes and that transferred intent may apply to only one of these types. "The first type of specific intent crimes are those that require a specific intent to cause a specific type of harm.... The second type are those which, by statutory definition, require a specific intent to cause a specific type of harm *to a specific person....*" *Ford,* 90 Md.App. at 685, 603 A.2d at 889 (emphasis in original). We have previously indicated that transferred intent does not apply to the latter class, namely those statutory offenses which require that the defendant's criminal intent be directed towards the actual victim. *State v. Wilson,* 313 Md. 600, 606 & n. 3, 546 A.2d 1041, 1044 & n. 3 (1988) (citations omitted). Section 386, at issue here, is of

this latter type; under § 386, it is a crime to "assault or beat any person, with intent to maim, disfigure or disable *such person. . . .*" (Emphasis added). Professor Perkins illustrates this type of statute with an old Kentucky law which provided that " 'if any person shall wilfully and maliciously shoot at and wound another with an intention *to kill him,*' " he has committed a felony. Perkins & Boyce at 925–26 (quoting *Commonwealth v. Morgan,* 74 Ky. 601, 602 (1876)). Interpreting this statute, the Kentucky court said, " '[i]f he wilfully and maliciously shoots at one with an intention to kill him and wounds another, he does not violate the statute.' " *Id.* (quoting *Hall v. Commonwealth,* 17 Ky.L.Rep. 1365, 1366 (1896)). As the court said in *Morgan,* "he did not wound the person at whom he shot . . . nor did he shoot at the person whom he did wound. . . .." *Morgan,* 74 Ky. at 602; *see also State v. Williamson,* 203 Mo. 591, 102 S.W. 519, 520 (1907); *State v. Mulhall,* 199 Mo. 202, 97 S.W. 583, 586–87 (1906) (both construing similar Missouri statute to same effect). The analogy could not be more direct; the plain statutory language of § 386 precludes the application of transferred intent.

Apart from these statutory grounds, the application of transferred intent to the crime of assault with intent to disable is also precluded by the underlying nature of the crime. It is a fundamental tenet of criminal law that a completed crime requires the concurrence of a *mens rea,* a guilty mind, and an *actus reus,* a bad act. The purpose of transferred intent is to link the mental state directed towards an intended victim, i.e., the intent to kill, maim, or disable that person, with the actual harm caused to another person. In effect, transferred intent makes a whole crime out of two component halves.

Any discussion of transferred intent in Maryland must focus on *Gladden v. State, supra,* in which this Court recognized the continuing viability of transferred intent. *Gladden* traced transferred intent back to its English common law heritage and the early cases it cited support the

view that the doctrine was intended to enable conviction of a defendant of the crime he intended to commit *only when that crime was not committed upon the intended victim.*[10] The Court quoted Professor Perkins to make the same point:

" '[i]f one intends injury to the person of another under circumstances in which such a mental element constitutes *mens rea*, and in the effort to accomplish this end he inflicts harm *upon a person other than the one intended*, he is guilty of the same kind of crime as if his aim had been more accurate.' " (Emphasis added).

*Gladden*, 273 Md. at 404, 330 A.2d at 188 (quoting R. Perkins, *Criminal Law* 825 (2d ed. 1969)); *See also* W. Prosser, *Transferred Intent*, 45 Tex.L.Rev. 650, 650 (1967).

 The underlying rationale for the doctrine also suggests that transferred intent should apply only when, without the doctrine, the defendant could not be convicted of the crime at issue because the mental and physical elements do not concur as to either the intended or the actual victim. As Dean Prosser notes, "[t]he early criminal cases were understandably preoccupied with mens rea, moral guilt, and the obvious fact that if the defendant was not convicted there would be no one to punish for the crime." *Id.* at 653.[11]

---

10. *See, e.g., Rex v. Plummer*, 1 Kelyng 109, 84 Eng.Rep. 1103 (1701) ("[a]s if a man out of malice to A. shoots at him to kill him, *but misses him* and kills B. it is no less a murder than if he had killed the person intended."); Sir Matthew Hale, 1 *History of Pleas of the Crown* 466 (1736) ("if A. by malice fore-thought strikes at B. *and missing him* strikes C. whereof he dies, tho he never bore any malice to C. yet it is murder, and the law transfers the malice to the party slain. . . ."); Sir William Blackstone, 4 *Commentaries on the Laws of England* 200–01 (Cooley, 3d ed. 1884) ("Thus if one shoots at A. *and misses him,* but kills B., this is murder; because of the previous felonious intent, which the law transfers from one to the other.") (emphases all added).

11. In support, Prosser cites the 1576 case of *The Queen v. Saunders & Archer*, 2 Plowd. 473, 474, 75 Eng.Rep. 706, 708 (1576), in which it was said:

 Thus, transferred intent makes a whole crime out of two halves by joining the intent as to one victim with the harm caused to another victim. Transferred intent does *not* make two crimes out of one. Where the crime intended has actually been committed against the intended victim, transferred intent is unnecessary and should not be applied to acts against unintended victims. The California Court of Appeal made this point clearly when reversing one of two first-degree murder convictions of a defendant who intended to kill one victim and also accidentally killed a second victim. *People v. Birreuta,* 162 Cal.App.3d 454, 208 Cal. Rptr. 635 (1984). The court said:

> "The function of the transferred intent doctrine [in first degree murder cases] is to insure the adequate punishment of those who accidentally kill innocent bystanders, while failing to kill their intended victims. But for the transferred intent doctrine, such people could escape punishment for murder, even though they deliberately and premeditatedly killed—because of their 'lucky' mistake. The transferred intent doctrine is borne of the sound judicial intuition that such a defendant is no less culpable than a murderer whose aim is good. It insures that such a defendant will not be allowed to defend against a murder charge by claiming to have made a mistake of identity, a poor aim or the like.
>
> When the intended victim is killed, however, there is no need for such an artificial doctrine. The defendant's premeditation, deliberation, intent to kill and malice aforethought are all directly employable in the prosecution for murdering his intended victim. The accidental killing may thus be prosecuted as a manslaughter or second

---

"[T]he said *John Saunders* gave the Poison with the Intent to kill a Person, and in the giving of it he intended that Death should follow. And when Death followed from his Act, although it happened in another Person than her whose Death he directly meditated, yet it shall be Murder in him, for he was the original Cause of the Death, and *if such Death should not be punished in him, it would go unpunished.*" (Emphasis added).

degree murder without ignoring the most culpable mental elements of the situation. There is no danger that a premeditated killing will go unpunished or be treated as a manslaughter because the murder of the intended victim will presumably be the subject of prosecution."
*Id.* at 460, 208 Cal.Rptr. at 638–39.

Although *Birreuta* addressed the crime of first degree murder, its analysis is applicable whatever the crime in question. If transferred intent is accurately described as the "intent following the bullet" to make a completed crime, the doctrine has no application when the bullet's terminus is irrelevant and the crime at issue is complete without invoking transferred intent. In *Birreuta*, where the defendant managed to complete the crime of murder against his intended victim, the court properly refused to transfer his intent to murder to another, unintended, victim. Transferred intent is equally inapplicable to other circumstances where the subject crime is already completed as to an intended victim, such as attempts or other crimes that can be completed without the necessity of physical contact. Such crimes have one thing in common—where the "bullet" ends up is superfluous to the crime, so there is no need for the intent to "follow the bullet" to link the crime's mental and physical elements. The crime at issue here, assault with intent to disable, is such a crime. Because the elements of an assault with intent to disable are (1) an assault and (2) an intent to disable, the crime is complete regardless of whether the projectile reaches its target. The requisite intent has already been formed and the requisite assault has already been committed; no intent need be transferred to complete a crime.

We realize that this conclusion seems at odds with our holding in *State v. Wilson*, 313 Md. 600, 546 A.2d 1041 (1988), in which we applied transferred intent to the crime of attempted murder. In *Wilson*, the defendants, two brothers, became involved in a dispute with one Marvin Brown. Brown fled after the Wilsons threatened to pistol-whip him. Both Wilsons then drew handguns and fired

multiple shots towards Brown, who managed to avoid the bullets. One of the shots hit and injured Juan Kent, an innocent bystander. *Id.* at 601–02, 546 A.2d at 1042. This Court affirmed the defendants' attempted murder convictions for both victims, invoking the transferred intent doctrine to uphold the attempted murder of Kent, the bystander.

We believe *Wilson* should not have applied transferred intent to attempted murder.[12] First, as we have noted, the purpose of transferred intent is not to multiply criminal liability, but to prevent a defendant who has committed all the elements of a crime (albeit not upon the same victim) from escaping responsibility for that crime. If the defendant charged with attempted murder, shot at but missed the intended victim, the defendant may still be convicted of attempted murder of that victim. The completed crime has been committed on the intended victim, and the fiction of transferred intent would not so much transfer the intent as replicate it and apply it to another victim, thus making multiple specific intent crimes from one single act intended to injure one person.[13] On facts virtually identical to *Wilson*, where the defendant shot at and missed his intended victim but hit a seven-year-old boy, the California Court of Appeal concluded that transferred intent is inapplicable as a means of assigning liability for attempted mur-

---

**12.** In fact, one of the cases relied upon by *Wilson* was the California case of *People v. Neal,* 97 Cal.App.2d 668, 218 P.2d 556 (1950). *Neal* has since been distinguished in California as "not authority" for this proposition because the applicability of transferred intent had not been challenged. *People v. Czahara,* 203 Cal.App.3d 1468, 1473, 250 Cal.Rptr. 836, 839 (1988).

**13.** Although the *Wilson* Court acknowledged it was not at issue in that case, it also stated in a footnote its belief that transferred intent would also apply to statutory assault with intent to murder under § 12. *Wilson,* 313 Md. at 607 n. 4, 546 A.2d at 1044 n. 4. For the same reason that transferred intent does not apply to assault with intent to disable under § 386, it does not apply to assault with intent to murder under § 12—in both instances, the crime is complete before the projectile reaches its target.

der. *People v. Calderon*, 232 Cal.App.3d 930, 283 Cal.Rptr. 833 (1991). The court said:

> "[The defendant] committed a completed crime against his intended victim which is as serious as the greatest level of culpability which could be achieved by transferring that intent to his unintended victim, obviating the need to apply the doctrine."

*Id.* at 936, 283 Cal.Rptr. at 836. The court held that "the better rule is that 'where a single act is alleged to be an attempt on two persons' lives, the intent to kill should be evaluated independently as to each victim, and the jury should not be instructed to transfer intent from one to another.'" *Id.* at 937, 283 Cal.Rptr. at 837 (quoting *People v. Czahara*, 203 Cal.App.3d 1468, 1474, 250 Cal.Rptr. 836, 840 (1988)). Professors Perkins & Boyce agree:

> "If, without justification, excuse or mitigation D with intent to kill A fires a shot which misses A but unexpectedly inflicts a non-fatal injury upon B, D is guilty of an attempt to commit murder,—but the attempt was to murder A whom D was trying to kill and not B who was hit quite accidentally. And so far as the criminal law is concerned there is no transfer of this intent from one to the other so as to make D guilty of an attempt to murder B."

Perkins & Boyce at 924–25.

A related reason why transferred intent cannot properly apply to attempted murder derives from the fact that the crime of attempted murder requires no physical injury to the victim. Although in *Wilson* the bystander was in fact injured, injury is not an essential element of attempted murder. Assuming an attempted murder scenario where the defendant fires a shot at an intended victim and no bystanders are physically injured, one sees that it is virtually impossible to decide to whom the defendant's intent should be transferred. Is the intent to murder transferred to everyone in proximity to the path of the bullet? Is the intent transferred to everyone frightened and thereby as-

saulted by the shot? There is no rational method for deciding how the defendant's intent to murder should be transferred.[14]

The result in *Wilson* can best be explained and justified by distinguishing between transferred intent and what is essentially concurrent intent. Although transferred intent should not have been invoked to convict the Wilsons of attempted murder of the bystander because the crime of attempted murder was already complete as to the primary victim, the convictions could have been properly upheld on the basis of such concurrent intent. We elaborate.

■ In transferred intent, the intended harm does not occur to the intended victim, but occurs instead to a second unintended victim. The actual result is an unintended, unanticipated consequence of intended harm. For example, consider a defendant who shoots a single bullet at the head of A, standing with B and C. If the defendant misses A and instead kills B, the defendant's intent to murder A will be transferred to allow his conviction for B's murder. The intent is concurrent, on the other hand, when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and

14. We note that refusal to apply transferred intent to attempted murder by no means relieves a defendant of criminal liability for the harm caused to unintended victims. The defendant clearly can be convicted of attempted murder as to the primary victim and some other crime, such as criminal battery, as to other victims. *See, e.g., Czahara,* 203 Cal.App.3d at 1475, 250 Cal.Rptr. at 840 (suggesting that, as to unintended victim, defendant could be convicted of assault with a deadly weapon or statutory crime of firing into an occupied vehicle).

attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. The defendant's intent need not be transferred from A to B, because although the defendant's goal was to kill A, his intent to kill B was also direct; it was concurrent with his intent to kill A. Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone. This situation is distinct from the "depraved heart" situation because the trier of fact may infer the actual intent to kill which is lacking in a "depraved heart" scenario.[15]

In *Wilson*, then, the jury could have found from the nature of the attack an intent to murder Kent concurrent with the intent to murder Brown. Where the Wilsons specifically intended to kill Brown, and attempted to do so by firing multiple bullets from two handguns, they could have intended a "kill zone" around Brown akin to the automatic weapon or explosive attack described above. The factfinder could conclude that the Wilsons intended to kill

---

**15.** "Depraved heart" situations occur when the defendant has no specific intent to kill. *See Robinson v. State*, 307 Md. 738, 743, 517 A.2d 94, 98 (1986) (" '[d]epraved heart' murder does not require any specific intent to kill or injure. [It] must be based on general recklessness; the act on which the charge is based must be dangerous to a number of persons, but not directed at any particular person."); R. Perkins, *Criminal Law* 36 (2d ed. 1969) ("depraved heart" exists "even if there was no actual intent to kill or injure"). (Footnotes omitted).

everyone in the direct path of their bullets. Kent, the bystander victim, was obviously in the Wilsons' direct line of fire and the evidence permitted finding concurrent intent to kill everyone in the path of the bullets. In essence, we still believe *Wilson* reached the right result, although we no longer adopt its explanation. There was sufficient evidence to support convictions for the attempted murders of both Brown and Kent, but not via transferred intent theory. The sufficiency of the evidence should be based instead on the inference of a concurrent intent to murder the bystander Kent that could be drawn from the multiple shots fired towards both victims.

## V. *Collateral Estoppel—Double Jeopardy*

Finally, Ford claims that, because his motions for judgments of acquittal were granted as to certain counts relating to certain victims, the trial court improperly allowed similar counts relating to other victims to go to the jury. Ford relies on the collateral estoppel form of double jeopardy for this argument, claiming that the subsequent convictions violated both the Double Jeopardy Clause of the Fifth Amendment and Maryland common law.

In *Ashe v. Swenson*, 397 U.S. 436, 445, 90 S.Ct. 1189, 1195, 25 L.Ed.2d 469, 475 (1970), the Supreme Court held that the federal rule of collateral estoppel in criminal cases is incorporated in the Fifth Amendment's guarantee against double jeopardy. In *Ashe*, four armed men robbed six others who were playing poker. The defendant was indicted and tried for robbery of one of the six victims. He was acquitted of this charge, but then indicted for robbery of another victim of the poker game robbery. The Supreme Court determined from the record that when the jury acquitted the defendant based on "insufficient evidence," it had concluded that the defendant was not one of the perpetrators. The Court held that the doctrine of collateral estoppel, as incorporated in the Fifth Amendment, prohibited retrial of this issue of ultimate fact decided in the first trial and integral to a conviction on another robbery charge

in a subsequent trial. *Id.* at 442–43, 90 S.Ct. at 1193–94, 25 L.Ed.2d at 475.

Maryland common law also recognizes the collateral estoppel form of double jeopardy. This common law collateral estoppel "prevents the State from litigating a second time an issue of ultimate fact where there has already been a final determination of that issue in the accused's favor." *Cousins v. State,* 277 Md. 383, 398, 354 A.2d 825, 834, *cert. denied,* 429 U.S. 1027, 97 S.Ct. 652, 50 L.Ed.2d 631 (1976) (citing *Ashe*). "The collateral estoppel form of double jeopardy is not based on two offenses being the same, but on two criminal charges having a common necessary factual component." *Apostoledes v. State,* 323 Md. 456, 463, 593 A.2d 1117, 1121 (1991). It may apply both to subsequent trials and within the same trial. *Brooks v. State,* 299 Md. 146, 155, 472 A.2d 981, 986 (1984). Ford relies on *Wright v. State,* 307 Md. 552, 515 A.2d 1157 (1986), where the trial judge granted the defendant's motion for judgment of acquittal on the felonies underlying a felony murder count, ruling that "there is not sufficient evidence to require the Defendant to put on a defense" with respect to the felony counts. *Id.* at 556, 515 A.2d at 1159. At the close of the defense's case, however, the trial judge decided to submit the felony murder count to the jury, which convicted the defendant of felony murder. This Court reversed the conviction, noting that

> "the rule is not limited to the situation where the government attempts to institute a wholly new prosecution on the same charge after a judgment in an earlier prosecution. Rather, the acquittal on the merits terminates the initial jeopardy on a charge, normally precluding any type of further criminal proceedings on the same charge or, in some instances, on a related charge."

*Id.* at 563, 515 A.2d at 1162–63; *see also Brooks,* 299 Md. at 155, 472 A.2d at 986 (also reversing conviction where trial judge first granted motion for judgment of acquittal, but

then decided to send case to jury, which convicted defendant).

In *Wright* we held that in applying collateral estoppel principles, "[t]he critical question is whether the trial court's action at the close of the State's case constituted " 'a resolution, correct or not, of some or all of the factual elements of the offense charged.' " *Wright*, 307 Md. at 569, 515 A.2d at 1166 (quoting *Sanabria v. United States*, 437 U.S. 54, 71, 98 S.Ct. 2170, 2183, 57 L.Ed.2d 43, 58 (1978)) (other citations omitted). The analysis focuses on what the fact finder did find or must have found. *Apostoledes*, 323 Md. at 464, 593 A.2d at 1121. "When a defendant claims that a judge's acquittal on one count has collaterally estopped further prosecution of a related count, the reviewing court may examine the judge's express basis for the ruling in order to determine if the judge resolved in the defendant's favor an ultimate factual issue essential to both counts." *Id.* (citing *State v. Anderson*, 320 Md. 17, 29–32, 575 A.2d 1227, 1233–34 (1990)). When a reviewing court undertakes this analysis, it must examine the substance of what occurred, not merely its procedural form. *Wright*, 307 Md. at 569–70, 515 A.2d at 1166. We also note that, on appeal, we are not concerned with whether the trial court was right or wrong in granting a judgment of acquittal. *See id.* at 562–63, 515 A.2d at 1162 (an acquittal on merits is final and precludes further trial proceedings, and "[t]his is true even if the acquittal is based upon an error of law or an incorrect resolution of the facts."). Our only concern is whether the judgment reflects resolution of factual elements of the charged offenses. With this introduction, we turn to Ford's double jeopardy claims.

Ford first asserts that the granting of judgments of acquittal on the counts of assault with intent to disable certain victims in a vehicle was necessarily a finding that he lacked the specific intent to commit the crime against *any* victims in that vehicle. Specifically, he claims that the judgments of acquittal with respect to the counts of aggra-

vated assault on Norma Bennett, Leanne Ekberg, and John Miller should have precluded his conviction on the same charge with respect to Destiny Morris, who sat between Bennett and Ekberg in the front seat of the truck.

A careful examination of the trial judge's reasoning, however, shows that these judgments of acquittal did not resolve an ultimate fact favorable to Ford. In fact, the judge explicitly found that the State had made out a *prima facie* case with respect to the passengers in the Miller truck, but was concerned that the jury might overreach on the potentially confusing theory of transferred intent. The judge stated:

> "I have to err on the side of caution with respect to those type of charges and the defendant before the Court, and *although the State has made out a prima facie case with respect to their evidence* at this juncture, I have a great concern about overreaching with respect to the doctrine of transferred intent ... and taking out [these counts] ... is not going to change anything because the defendant's statement is already in this case." (Emphasis added).

Thus, the judge's ruling did not resolve in Ford's favor "an ultimate factual issue" which would preclude his conviction on similar charges as to other victims. One might even conclude that, by dismissing these counts, the trial judge actually protected Ford from potentially erroneous convictions. In an attempt to ease the jury's burden, the judge merely eliminated the charges he felt were surplusage.

■ Ford next turns from intra-vehicle issues to counts relating to occupants of different vehicles. He claims that because the trial judge granted motions for judgments of acquittals of assault with intent to disable as to passengers in some vehicles, he could not be convicted of the same crime with respect to passengers in other cars. Specifically, he claims his acquittal of aggravated assault of Michelle Bazilio, Dontue Peoples, and Pongee Johnson, passengers in three separate vehicles, necessarily negated his intent to

disable Rodney Marbury and LaShonda Thompson, passengers in two other vehicles. Similarly, he contends that because he was acquitted of assault with intent to disable three of the vehicles' drivers, he could not be convicted of assault with intent to disable the drivers of seven other vehicles.

The Court of Special Appeals answered this charge succinctly and, we think, quite correctly:

> "Each instance of rock throwing was a separate action by appellant, and, therefore, each separate action supported individualized consideration. For that reason alone, granting a motion for acquittal on some counts alleging attacks on other vehicles did not implicate at all the separate behavior and evidence necessary to support guilty verdicts on other counts."

*Ford,* 90 Md.App. at 698, 603 A.2d at 895.

Finally, the trial judge granted judgments of acquittal on all charges flowing from attacks on the cars driven by Tonia Wilkins and Patricia Jones. These included malicious destruction of the vehicles and assault and battery upon Wilkins, Jones, and Jones' passenger, Kim Mazacapa. Mazacapa did not testify and neither Wilkins nor Jones, who did testify, saw anyone throwing rocks. Ford contends that if these occupants' failure to see the perpetrators warranted judgments of acquittal, then judgments of acquittal should likewise have been granted on all charges involving two other vehicles whose occupants also did not testify that they saw anyone throwing rocks.

The judge made clear at trial, however, that the facts made the Wilkins and Jones vehicles unique. The Jones vehicle was the first to be hit by rocks, and Patricia Jones testified that she did not see where the rocks came from or who the rock throwers might be. The court ruled that, from this testimony, the jury could make one inference in favor of Ford and one favorable to the State, and stated: "But in my courtroom ties go to the runner." Although other persons had identified the rock throwers by the colors

they were wearing, those identifications were for actions occurring after the Jones incident. Thus, the trial judge opined that the jury would have to speculate that the same rock throwers threw at Jones' car. Accordingly, the judge granted the motion as to all of the counts concerning Jones' car. The trial judge's reasoning distinguished the Jones vehicle from the others. Thus, there was no ruling in Ford's favor on an ultimate fact that would collaterally estop convictions on other counts.

Wilkins' vehicle was perhaps even more unique than the Jones vehicle, because Wilkins did not realize at all that her car had been hit by a rock. She testified at trial that, as she drove on the Beltway, she heard a "big thump on my side of the car." She kept driving and did not notice the dents on her car until the next morning. She never observed any rock throwers. Thus, the evidence as to Wilkins' vehicle was the weakest of all. In granting judgments of acquittal on charges relating to Wilkins' vehicle, the court again based its reasoning on its unwillingness to let the jury overreach. There was no finding of ultimate fact in Ford's favor, but merely an attempt by the trial judge to sort out complicated charges and to treat the defendant fairly. Since there was no resolution of an ultimate fact in Ford's favor, collateral estoppel principles were not implicated. We affirm the judgment of the Court of Special Appeals on these and the preceding counts.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.

McAULIFFE, RODOWSKY and KARWACKI, JJ., concur.

McAULIFFE, Judge, concurring.

I concur in the result, and join in the Court's opinion except as to the dictum concerning the doctrine of transferred intent, found in Part IV C.

The Court holds that the defendant failed to preserve the alleged error of instructing the jury about transferred intent, and that in any event, the evidence was sufficient to support the convictions on other grounds. The Court then proceeds by way of dictum to discuss the doctrine of transferred intent, and to invalidate a portion of that doctrine that we recently and specifically approved in *State v. Wilson*, 313 Md. 600, 546 A.2d 1041 (1988).

Specifically, the Court states that the doctrine cannot apply: 1) to a crime requiring a specific intent to cause a specific type of harm to a specific person; and, 2) where the crime intended has actually been committed against the intended victim. Contrary to the suggestion of the majority, the first limitation on the use of the doctrine was not approved in *Wilson*, 313 Md. at 606 n. 3. Although of dubious validity, the first limitation is not the part of the Court's dictum that prompts this opinion. Rather, I am concerned with the Court's unnecessary, and in my opinion ill-advised, acceptance of the second limitation.

The Court cites three decisions of California Courts of Appeal in support of the second limitation. A California case not cited by the majority, *People v. Carlson*, 37 Cal.App.3d 349, 112 Cal.Rptr. 321 (1974), appears to be to the contrary. In that case, the defendant killed his pregnant wife under circumstances sufficient to support a finding of manslaughter. Although the defendant may have had no intention to kill the unborn child his wife was carrying, the California court found that he would be criminally liable for his wife's death and the death of the fetus under the doctrine of transferred intent. *Id.* at 325. The rationale of the *Carlson* case was adopted and approved by the Court of Appeals of Michigan in *People v. Lovett*, 90 Mich.App. 169, 283 N.W.2d 357, 360 (1979). In 1989, the Supreme Court of California referred to two of the cases cited by the majority, and to *Carlson*, stating that although it had approved the rule of transferred intent in cases involving homicides, the court had not considered application of the doctrine where both the intended and the unin-

tended victims were killed or injured. *People v. Hunter,* 49 Cal.3d 957, 264 Cal.Rptr. 367, 379, 782 P.2d 608, 620 (1989).

Other courts have taken a different view of the applicability of the doctrine of transferred intent where both the intended and unintended victims were injured or killed. In *State v. Worlock,* 117 N.J. 596, 569 A.2d 1314 (1990), the Supreme Court of New Jersey rejected the defendant's argument that it should follow the rationale of the California courts relied upon by the majority here. The court said:

> When a defendant contemplates or designs the death of another, the purpose of deterrence is better served by holding that defendant responsible for the knowing or purposeful murder of the unintended as well as the intended victim. Hence, we reject defendant's argument that the successful killing of the intended victim prevents the 'transfer' of that intent to an unintended victim.

*Id.* at 1325. The New Jersey court also noted that federal courts have likewise applied the principle of transferred intent in cases where the intended victim is killed by the same act that kills the unintended victim, citing *United States v. Sampol,* 636 F.2d 621, 674 (D.C.Cir.1980), and *United States v. Weddell,* 567 F.2d 767, 769–70 (8th Cir. 1977), *cert. denied,* 436 U.S. 919, 98 S.Ct. 2267, 56 L.Ed.2d 761 (1978). *Id.*

Recently, the Supreme Court of Delaware stated: "We adopt the view announced by the New Jersey Supreme Court in *State v. Worlock....*" *Robinson v. State,* 1992 WL 426439, 620 A.2d 859 (Del.Supr.1992) (unpublished). The Delaware court found that view entirely consistent with the statute of that state dealing with transferred intent, which provides:

> The element of intentional or knowing causation is not established if the actual result is outside the intention or the contemplation of the defendant unless:
>
> (1) The actual result differs from that intended or contemplated, as the case may be, only in the respect that a different person ... is injured or affected....

11 Del.C. § 262. The Delaware statute essentially tracks § 2.03 of the Model Penal Code (1962).

The Court's newly announced limitation on the doctrine of transferred intent is likely to present some interesting problems. Assume, for example, that the defendant, intending to kill *A*, shoots and wounds him, but the bullet passes through *A* and kills *B*. Under the Court's theory, I assume the defendant would be guilty of the murder of *B*, although also guilty of attempted murder or assault with intent to murder *A*. If *A* had also died, the Court would hold that the defendant could not be convicted of the murder of *B*, but only of battery, or perhaps manslaughter. What happens, then, if the defendant is convicted of the murder of *B* while *A* is still alive, but *A* dies of wounds received in the assault within a year and a day of the shooting?

In my judgment, the Court goes too far in its attempt to limit the utilization of the doctrine of transferred intent in criminal cases. I would simply excise that dictum from the opinion.

RODOWSKY and KARWACKI, JJ., join in this opinion.