Filed 12/16/19; Opinion following transfer from Supreme Court

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C077711 |
| Plaintiff and Respondent, | (Super. Ct. No. CM034653) |
| v. | OPINION ON TRANSFER |
| SHANE MICHAEL WARNER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Butte County, Kristen A. Lucena, Judge.  Affirmed.

Harry I. Zimmerman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Caely E. Fallini, Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II to VII of the Discussion.

1

This case involves a jury finding of attempted homicide pursuant to a "kill zone" theory. It arises from a shooting in a crowded bar. On a Saturday night of a long July 4th holiday weekend, defendant Shane Michael Warner took a semiautomatic hand gun, concealed in his waistband into a bar. He shot across the bar's semidark dance floor, illuminated by a strobe light, at I. Smith, who had attacked him a few weeks earlier. Defendant emptied the gun's clip of 10 bullets and wounded, but did not kill his primary target, Smith, and wounded, but did not kill an innocent bystander, N.C. Defendant claimed to have acted in self-defense, but there was no evidence that Smith was armed.

The prosecution charged defendant with two counts of attempted murder and one count of assault with a semiautomatic firearm. The jury was unable to reach a verdict on the attempted murder of Smith, and the prosecution eventually dismissed that count. The jury acquitted defendant of the attempted murder of N.C., but found him guilty of the lesser included offense of attempted voluntary manslaughter. The jury convicted defendant of assaulting N.C. with a semiautomatic firearm. The trial court sentenced defendant to 22 years in prison, calculated as follows: nine years (upper term) for the assault, plus 10 years for personal use of a firearm pursuant to Penal Code section 12022.5, subdivision (a), plus three consecutive years for the personal infliction of great bodily injury. The trial court stayed the attempted voluntary manslaughter sentence of five years six months pursuant to Penal Code section 654.

In the published portion of this opinion defendant argues there is insufficient evidence to sustain his conviction for attempted voluntary manslaughter because he did not intend to kill N.C. He argues it was error to allow the prosecution to infer intent from a "kill zone" theory, and to so instruct the jury. The instruction said: "a person may intend to kill a specific victim or victims and, at the same time, intend to kill everyone in a particular zone of harm or . . . 'kill zone.' " The intent is concurrent. It occurs " 'when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming

2

everyone in that victim's vicinity.' " (*People v. Bland* (2002) 28 Cal.4th 313, 329 (*Bland*).) The intent is imputed to the defendant from the extreme danger to life tendered by such conduct.

We conclude that the trial court did not err in allowing the prosecutor to argue defendant intended to kill N.C. under a "kill zone" theory, and in so instructing the jury. " 'Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.' " (*Bland, supra,* 28 Cal.4th at pp. 329-330, quoting *Ford v. State* (Md.Ct.App. 1993) 330 Md. 682, 717.) Defendant's actions in shooting a gun multiple times at a group of people on a crowded, semidark dance floor provided facts from which a reasonable jury could infer he intended to kill people on the dance floor, including N.C.

We issued a published opinion on May 7, 2019, affirming the judgment. On May 22, 2019, defendant filed a petition for rehearing asking us to address his supplemental brief seeking a remand to the trial court for retroactive application of Senate Bill No. 620 (2017-2018 Reg. Sess.), which would allow the trial court to exercise its discretion to dismiss the firearm enhancement. We will remand the matter to the trial court for the sole purpose of determining whether to exercise its discretion to dismiss the section 12022.5, subdivision (a) firearm enhancement.

Even though the sentence for attempted voluntary manslaughter was stayed, defendant petitioned the Supreme Court for review, raising the issue of the "kill zone" instruction. The Supreme Court granted review, and directed us to vacate our decision and reconsider the cause in light of *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*), decided after our opinion was filed. After reconsidering the matter, we again affirm the judgment, and remand to allow the trial court to consider whether to exercise its discretion to strike the sentencing enhancement.

3

## FACTUAL AND PROCEDURAL BACKGROUND

The shooting occurred at LaSalle's Bar in Chico, California. About three weeks prior to the shooting, defendant and Smith got into an argument after defendant confronted Smith about wearing a blue Los Angeles Dodgers cap. Defendant and Smith were told to leave the bar. After defendant and Smith left the bar, Smith punched defendant several times in the face. Defendant testified that before he lost consciousness, he heard Smith say, "If you come around my turf again, I'm going to kill you." Defendant sustained a concussion, a contusion on his right and left eye, a chipped tooth, scratches all over his face, a busted lip, and a sore rib. Defendant testified that his friends later told him to stay away from Smith because Smith was dangerous and had gang ties.

Defendant testified that before the fight, he had purchased an unregistered nine-millimeter Glock handgun off the streets. He said he purchased it to protect his household, but did not normally carry it on his person. Nevertheless, he had it in his back waistband when he went to LaSalle's Bar on July 2, 2011, the night of the shooting. He arrived at the bar wearing a red Cincinnati Reds cap, even though he was a San Francisco Giants fan. The Cincinnati cap matched his outfit, which was all red and black.

Andre Shaw was at LaSalle's Bar the night of the shooting with his friend N.C. Defendant, whom they did not know, asked Shaw at one point if he was from Chico. N.C. and Shaw went to the bar's back patio, and Shaw was dancing on the dance floor. N.C. was standing next to him. Shaw heard two shots, then looked around to see defendant standing next to the DJ booth with a gun in his hand, firing it in the middle of the bar. Defendant was firing in Shaw's direction, and Shaw thought that defendant was aiming for him. Shaw ran out of the bar and did not see anyone get injured.

N.C. was standing near Shaw when she felt something hit her back. She fell to the floor. She saw Smith also on the ground, but not close enough for her to touch. She saw defendant standing at Smith's feet, shooting at Smith's chest area as Smith lay on the ground. N.C. was having difficulty breathing because her lung had been punctured. She

4

also had a bruise on her right front hip where she carried her ATM card and ID. She later discovered a bullet lodged in her ID. A bullet went in her arm, and she continues to have muscle spasms in her arm and back.

Another bar patron heard the first two shots, then moments later saw a man (Smith) drop to the ground. The shooter ran up, stood over the victim, and continued shooting him. The shooter emptied his clip into Smith as Smith lay on the ground, stepped away, did a little yell as if he'd scored a touchdown, and ran out the side door. Another patron said she heard the shots first, turned, and saw defendant walking across the bar shooting the gun.[1]

One of the bartenders saw defendant shooting, and saw him slowly walking and moving to the right, swooping with his arm. Defendant had a snarl on his face. Defendant shot with one hand, and did not stabilize the gun with the other hand. There were about 280 patrons in the bar that night, plus staff. The bouncers count the patrons with a clicker as they come in. The bartender estimated there were about 50 people in the back patio area where the shooting occurred.

Defendant ran out of the bar and was chased and caught by one of the bouncers, who had looked up to see defendant after hearing the first shot. He watched defendant walk up to Smith and shoot again two or three more times. When the bouncer caught defendant after the shooting, defendant told the bouncer he had not done the shooting. The bouncer told defendant he had seen defendant do it, to which defendant did not reply. Defendant's gun was found discarded in some bushes. Defendant also told police initially that he had not done anything, and had not been at LaSalle's Bar that night.

When defendant was booked into the Butte County jail the next day, he stated that he was a "Blood associate but not a gang member," and that he could not be housed with

---

[1] She heard more than one, but less than five shots before turning to look.

Crips because the victim was "basically a Crip." Defendant thought Smith was a Crip because he wore the color blue.

The parties stipulated that a gun recovered from the bushes was a Glock firearm. The slide of the gun was locked open and there was no ammunition inside the magazine or barrel. Ten spent casings were collected from the scene of the shooting. All were fired from defendant's gun. The first spent casing was found all the way across the bar. Five more casings were found about halfway to the victim, and four more casings were found beside the victim. The floor of the bar, which was asphalt, had three impact marks from bullets beside where Smith had fallen. Based on the damage to the bullet fragments, these marks appeared to have been made when defendant was shooting in a downward direction. Three bullet impact marks were found in the wooden fence behind Smith, and one bullet was recovered that passed through the fence and lodged in a post. The two bullets recovered from N.C., and a bullet recovered from Smith's back were also fired by defendant's gun. At least some of the bullet fragments recovered were hollow point bullets, designed to open up when they strike human tissue and create more damage. It was not possible to determine whether all the bullet fragments were from hollow point bullets.

N.C. was treated for a gunshot that entered her right shoulder, went into her chest, and out her back. She had a collapsed lung and bruising on her hip where a bullet lodged in her ID card. Smith was treated for multiple gunshot wounds. At least four bullets struck him, causing approximately eight bullet wounds. Smith suffered internal bleeding, and received 27 blood transfusions. Two bullets were not able to be removed because they were lodged too close to his spine. Smith's spleen and part of his left lung were removed. Smith was in the hospital for two weeks, then was transferred to a rehabilitation hospital.

Defendant testified at trial. He admitted taking a gun into a bar and shooting it. He argued he acted in self-defense. He stated that sometime after the fight, but before the

6

shooting, he heard from an acquaintance that Smith admitted being a little drunk the night of the fistfight, and that he said everything was "cool." Defendant took this to mean everything was not cool. The night of the shooting, Defendant saw Smith at LaSalle's Bar standing and talking to his friends. Smith started walking toward defendant. Defendant thought Smith was coming after him, so he pulled out his gun. Defendant claimed he fired two shots into the air as a warning.[2] When Smith kept coming toward him, he brought the gun down and started shooting at Smith. Defendant claimed he fired nine times, and the last three times were into the ground next to Smith. He claimed he saw no one around Smith, and that his whole focus was on Smith.

The jury was unable to reach a verdict on count 1, the attempted murder of Smith. The jury found defendant not guilty of count 2, the attempted murder of N.C., but guilty of the lesser included offense of attempted voluntary manslaughter. The jury found defendant guilty of count 3, assault of N.C. with a semiautomatic firearm. The jury also found true the special allegations attached to count 3, that defendant personally used a firearm within the meaning of Penal Code[3] section 12022.5, subdivision (a), and personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a). The prosecution later dismissed count 1 in the interest of justice.

The trial court stayed the sentence on count 2, attempted voluntary manslaughter. The court sentenced defendant to the upper term of nine years on count 3. The court also sentenced defendant to an additional 13 years for the enhancements, for a total aggregate sentence of 22 years.

---

[2]    None of the eyewitnesses confirmed this.

[3]    Undesignated statutory references are to the Penal Code.

7

DISCUSSION

I

Kill Zone Theory

A. Intent to Kill Requirement

Defendant challenges the theory of intent on which the prosecutor argued and the trial court instructed. The issue arises because both the attempted murder of N.C. and the attempted voluntary manslaughter of N.C., for which he was convicted, require an express intent to kill.

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) "Voluntary manslaughter requires either an intent to kill or a conscious disregard for life." (*People v. Bryant* (2013) 56 Cal.4th 959, 970.) However, a conscious disregard for life will not suffice for *attempted* voluntary manslaughter, which requires an intent to kill. "[A]ttempted voluntary manslaughter cannot be premised on the theory defendant acted with conscious disregard for life, because it would be based on the 'internally contradictory premise' that one can intend to commit a reckless killing." (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 710.) Finally, the theory of transferred intent does not apply to attempts. "The crime of attempt sanctions what the person intended to do but did not accomplish, not unintended and unaccomplished potential consequences." (*Bland, supra,* 28 Cal.4th at p. 327.) Thus, to prove defendant was guilty of attempted murder or the lesser included offense of attempted voluntary manslaughter, the prosecution had to prove that defendant had the intent to kill N.C.

To satisfy the element of intent to kill N.C., the prosecution relied on a "kill zone" theory, and the trial court gave a "kill zone" instruction. The "kill zone" instruction was in all material respects taken directly from CALCRIM No. 600: "As to Count 2 only, a person may intend to kill a specific victim or victims and, at the same time, intend to kill

8

everyone in a particular zone of harm or, quote, 'kill zone' end quote. [¶] In order to convict the defendant of the attempted murder of people on the dance floor in the back patio of LaSalles, the People must prove that the defendant not only intended to kill . . . Smith but also either intended to kill people on the dance floor in the back patio of LaSalles, or intended to kill everyone within the kill zone."

B. *Bland* and Its Progeny

The "kill zone" theory had its genesis with *Bland, supra*, 28 Cal.4th 313. In that case, the defendant shot into a vehicle containing the driver and two passengers. (*Id*. at p. 318.) The driver was killed, and the two passengers were wounded, but not killed. (*Ibid*.) The court held that the doctrine of transferred intent does not apply to attempted murder. (*Id*. at p. 328.) The court explained that even though transferred intent does not apply to attempted murder, the defendant may concurrently intend to kill others within a "kill zone." (*Id*. at p. 329.) " 'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. The defendant's intent need not be

9

transferred from A to B, because although the defendant's goal was to kill A, his intent to kill B was also direct; it was concurrent with his intent to kill A.  Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.' " (*Id*. at pp. 329-330, quoting *Ford, supra,* 330 Md. at pp. 716, 717.)

*Bland* pointed to two other cases, which it considered "kill zone" cases.  These were *People v. Vang* (2001) 87 Cal.App.4th 554 (*Vang*), and *People v. Gaither* (1959) 173 Cal.App.2d 662 (*Gaither*).  In *Vang,* the defendants shot 50 bullets at one occupied house, and an unspecified number of bullets at another occupied house.  (*Bland, supra,* 28 Cal.4th at p. 330; *Vang*, at p. 558.)  The Court of Appeal affirmed attempted murder convictions as to everyone occupying both houses.  (*Bland,* at p. 330.)  In *Gaither*, the defendant mailed poisoned candy to his wife, and was convicted for the attempted murder of others living at the residence.  (*Ibid*.)  *Bland* held that the case before it was a "kill zone" case because the jury could reasonably have found "a *concurrent* intent to kill those passengers when defendant and his cohort fired a flurry of bullets at the fleeing car and thereby created a kill zone." (*Id*. at pp. 330-331.)  Significantly, the Supreme Court's opinion gives no indication how many bullets were fired into the victims' car.

The Supreme Court further explained the "kill zone" or concurrent intent theory in *People v. Smith* (2005) 37 Cal.4th 733 (*Smith*).  In that case, the defendant fired a single bullet into a slow-moving vehicle driven by a female acquaintance of the defendant, and containing the driver's baby in an infant seat directly behind her.  (*Id*. at pp. 736-737.)  The bullet narrowly missed the mother and son.  (*Id*. at p. 736.)  The defendant argued his conviction for attempted murder of the baby should be reversed because there was no evidence he intended to kill the baby.  (*Id*. at p. 745.)  He claimed *Bland's* " 'kill zone' " theory did not apply because " '[t]his is not a bomb-on-the-airplane case or a rocket-propelled-grenade case or a hail-of-bullets case; this is a single-shot case.' " (*Ibid.*)

10

The Supreme Court responded that the " 'kill zone' " theory did not preclude two convictions of attempted murder where the defendant fired a single bullet injuring a woman and her baby, who were both in the defendant's direct line of fire. (*Smith, supra*, 37 Cal.4th at p. 745.) "*Bland* simply recognizes that a shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm. [Citation.] As we explained in *Bland,* 'This concurrent intent [i.e., "kill zone"] theory is not a legal doctrine requiring special jury instructions. . . . Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others.' " (*Id.* at pp. 745-746.)

In *People v. Stone* (2009) 46 Cal.4th 131, the Supreme Court held that a shooter who fires a single shot into a group of people, intending to kill one of the group, but not knowing or caring which one, may be convicted of a single count of attempted murder. In *People v. Perez* (2010) 50 Cal.4th 222, 230, the defendant shot from a slowly-moving vehicle into a group of seven police officers and one victim, hitting one of the police officers in the finger. The members of the group were standing between two and 15 feet away from the officer who was hit. (*Id.* at p. 227.) The court held, "a rational trier of fact could find that defendant's act of firing a single bullet at a group of eight persons from a distance of 60 feet established that he acted with intent to kill *someone* in the group he fired upon." (*Id.* at p. 230.) However, the evidence was insufficient to sustain the conviction for seven more counts of attempted murder, the defendant having fired only one bullet. (*Id.* at pp. 230-231.)

11

Finally, after we filed our original opinion in this case, the Supreme Court decided *Canizales*. The court held, "a jury may convict a defendant under the kill zone theory only when the jury finds that: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm— that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm." (*Canizales*, *supra*, 7 Cal.5th at pp. 596-597.) *Canizales* explained that the focus of the inquiry into a defendant's intent should be on the circumstances of the crime, i.e., the type of weapon used, the number of shots fired, the distance between the defendant and the victims, the distance between the victims and the primary target, and the openness of the area in which the attack occurs. (*Id*. at pp. 607, 611.) Ultimately, *Canizales* held the evidence was insufficient to warrant a kill zone instruction where the defendant fired five bullets at a distance of 100 to 160 feet on a wide city street, as opposed to an area from which the victims would have had limited means of escape. (*Id*. at pp. 609, 611.)

At the appellate level, courts have disagreed on whether the "kill zone" theory supporting an attempted murder conviction may be used where the method of killing is not designed to ensure the death of everyone in the "kill zone," as opposed to a method that merely creates an extremely high risk of killing those in the zone of danger. In *People v. McCloud* (2012) 211 Cal.App.4th 788, 793-794 (*McCloud*), two defendants shot a total of 10 bullets from their position in a parking lot into a crowded indoor party, killing two people and wounding another. One of the defendants was convicted of 46 counts of attempted murder. (*Id*. at p. 792.) The court expressed the view that a defendant cannot be convicted of attempted murder unless the method used was designed to kill everyone in the "kill zone." The court stated: "The kill zone theory thus does *not* apply if the evidence shows only that the defendant intended to kill a particular targeted

individual but attacked that individual in a manner that subjected other nearby individuals to a risk of fatal injury.  Nor does the kill zone theory apply if the evidence merely shows, in addition, that the defendant was aware of the lethal risk to the nontargeted individuals and did not care whether they were killed in the course of the attack on the targeted individual.  Rather, the kill zone theory applies only if the evidence shows that the defendant tried to kill the targeted individual *by killing everyone in the area in which the targeted individual was located.*  The defendant in a kill zone case chooses to kill *everyone* in a particular area as a means of killing a targeted individual within that area.  In effect, the defendant reasons that he cannot miss his intended target if he kills *everyone* in the area in which the target is located.  [¶] . . . In a kill zone case, the defendant does not merely subject everyone in the kill zone to lethal risk.  Rather, the defendant *specifically intends* that *everyone* in the kill zone die.  If some of those individuals manage to survive the attack, then the defendant—having specifically intended to kill every single one of them and having committed a direct but ineffectual act toward accomplishing that result—can be convicted of their attempted murder."  (*Id*. at p. 798.)

*McCloud* held that the evidence did not support 46 attempted murder convictions.  "In order for the kill zone theory to support 46 attempted murder convictions in the manner suggested by respondent, the record would have to contain evidence that Stringer and McCloud tried to kill the person who punched Stringer by killing all 46 people in the area where Stringer's assailant was located.  But the record contains no evidence that Stringer or McCloud intended to kill 46 people with 10 bullets.  Nor does the record contain evidence that it would have been possible for them to kill 46 people with 10 bullets (given the type of ammunition and firearm they used), or that they believed or had reason to believe it was possible."  (*McCloud, supra*, 211 Cal.App.4th at pp. 799-800.)

Despite *McCloud's* restrictive view of the type of kill power the defendant would have to employ to warrant a "kill zone" instruction, the court found sufficient evidence to support a conviction for eight attempted murders, i.e., the 10 shots fired by the defendant

13

convicted of the attempted murders, less two for the two victims who were killed. (*McCloud, supra*, 211 Cal.App.4th at p. 807.)

Likewise, in *People v. Cardona* (2016) 246 Cal.App.4th 608, the defendant was convicted of one count of murder and one count of attempted murder when he fired five or six shots at close range, killing the target, and wounding a bystander. (*Id.* at p. 611.) The court agreed it was error to give the "kill zone" instruction. (*Id*. at p. 612.) The court stated: "The shooting took place in a crowded party, but no witness testified that Cardona sprayed everyone near [the primary target] with gunfire. Without evidence of an attempt by Cardona to kill everyone in a particular area in order to kill [the primary target], it was error for the trial court to give the kill zone instruction." (*Id*. at p. 615.) Even though *Cardona* concluded it was prejudicial error to give a "kill zone" instruction, it held there was sufficient evidence to sustain an attempted murder conviction because the jury could have concluded that the defendant aimed at least one of his shots at the bystander. (*Id*. at p. 617.) Further, the act of firing toward a victim at close range in a manner that could inflict death is sufficient to support an inference to kill. (*Ibid*.)

On the other hand, *People v. Tran* (2018) 20 Cal.App.5th 561, held that the "kill zone" instruction was properly given where the defendant fired a "hail of bullets" (five) into a car, killing one person and wounding another, because he "intentionally exposed everyone in the vehicle to mortal danger." (*Id*. at pp. 564, 567.)

C. Substantial Evidence

Defendant argues the "kill zone" theory was not supported by substantial evidence in that his behavior does not support the inference he intended to kill everyone in the zone.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the

14

defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] . . . '[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may . . . be inferred from the defendant's acts and the circumstances of the crime.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 701.)

Defendant first made this argument after the prosecution presented its evidence, when he moved for a judgment of acquittal on count 2, which at that time alleged that defendant "did unlawfully, and with malice aforethought attempt to murder people in the back patio of LaSalle's."[4] Defendant argued the "kill zone" argument and instruction did not apply because the "kill zone" theory requires that the defendant intended to kill everyone in the "kill zone."

The trial court gave the following summary of the evidence before finding that there was sufficient evidence to support a "kill zone" theory:

> "In this case, the evidence that has been presented to the Court is that there were 35 to 50 people on the back patio area. The evidence that has been presented shows that there were 10 shell casings, all in the area— I'm going to call it a cone shape or a V-shaped area, from the rear of the back patio near the DJ booth towards the fence and the bartender—the bar in the front of the back patio.

---

[4] Count 2 was originally charged as an attempt to murder N.C., but the trial court found there was insufficient evidence to hold defendant to answer that count. The prosecution refiled count 2 as indicated above.

15

"The casings are along that zone. The area encompasses the dance floor and the fence and the bar towards the west of the back patio. [¶] . . . [¶]

"The evidence, as presented so far, indicates that the defendant used a semiautomatic handgun; that the gun was pointed towards Mr. Smith; that he did not use a stabilizing hand to assist in his aiming; that he turned the firearm sideways at one point; that he fired from a distance at first and then approached the target victim, Mr. Smith.

"There is no evidence of spraying of bullets in a[n] indiscriminate manner. Or of a hail of bullets in an indiscriminate manner.

"The situation at the time of the . . . shooting was dynamic. There were people dancing, moving about. There was music playing. There was strobe lights. And the number of shots fired were, approximately, 10.

"The evidence does show projectiles embedding into the fence behind the dance floor and near where Mr. Smith was standing, also, as well as some impressions on the concrete near Mr. Smith's body. [¶]

"[The] court does find that there is sufficient evidence to support a theory of a killing zone on the dance floor area.

"But as charged, people in the back patio of LaSalles, it's excessively broad and includes people that would be outside of the killing zone."

Thereafter, the prosecutor moved to amend the information to conform to proof, and for the court to reconsider its entry of judgment of acquittal on count 2. The trial court granted the People's request for reconsideration and allowed count 2 to be amended to charge defendant with attempting "to murder people on the dance floor in the back patio of LaSalle's." As indicated, the prosecutor argued the "kill zone" theory and the trial court gave the "kill zone" instruction.

Defendant's argument is that there was insufficient evidence the nature and scope of his attack sufficed to create a "kill zone." He argues the "kill zone" theory is inappropriate unless the perpetrator caused the target's death by means that would ensure

16

to "a near certainty" that everyone in the target's vicinity will also die. Defendant argues no such "overkill" was established here.

The "kill zone" theory is a way of expressing what some legal theorists have referred to as " 'oblique' " intention. (*In re Stonewall F.* (1989) 208 Cal.App.3d 1054, 1061, footnote 7, and authorities cited therein, disapproved on another point in *People v. Atkins* (2001) 25 Cal.4th 76.) "Direct intention is where the consequence is what you are aiming at. Oblique intention is something you see clearly, but out of the corner of your eye. The consequence is . . . a side-effect that you accept as an inevitable or 'certain' accompaniment of your direct intent." (Williams, *Oblique Intention* (1987) 46 Cambridge L.J. 417, 420-421.) Of course, certain, never really means certain. Oblique intention is more a practical certainty—something higher on the scale than a high probability. (*Ibid.*)

The theory, as expressed in the cases, does not require the defendant to use such force as to ensure that everyone in the "kill zone" is killed. If that were the case, nothing short of an explosive device strong enough to kill, not maim, would ever suffice. Exposure to poison may not always be a lethal dose, and bullets, even bullets from an automatic weapon, may not always hit their target. Illustrative of this fact are the "kill zone" cases cited in *Bland*. Defendant Gaither was guilty of seven counts of administering poison with intent to kill when he sent a pound and a half of candy containing enough arsenic to kill 75 people to a home inhabited by seven people. (*Gaither, supra*, 173 Cal.App.2d at pp. 665-667.) Defendants Vang and Yang were guilty of 10 counts of attempted murder when they shot 50 bullets at one house where the targeted victim was not present, but five people unrelated to the target were present (one died), and an unspecified number of bullets at another residence where five people were present. (*Vang, supra*, 87 Cal.App.4th at pp. 557-559, 563.) In neither case could it be said to a certainty that everyone in the "kill zone" would die, and in fact, not everyone did.

17

"Kill zone" is a somewhat unfortunate term, since the implication is that the theory requires a physical space that is necessarily deadly to all that inhabit it. This does not adequately describe the case of poisoned candy that sickens or kills those who eat it, or the case of gunfire, however concentrated, directed toward multiple persons. In truth, the concept attempts to describe a level of culpability and risk that society is unwilling to tolerate. It describes a type of intent that is "a kind of knowledge or realization." (Williams, *supra,* 46 Cambridge L.J. at p. 421.) Clearly, a defendant cannot escape punishment for murder by asserting that when he planted a bomb on an airplane he only intended to kill one particular passenger. This is because even though such defendant did not desire the death of the other passengers, he knew (barring some intervening factor) that everyone on the plane would be killed. No one would argue that he did not intend his actions would result in their death, and therefore that he intended to kill them. Similarly, if the same defendant were to be prevented from detonating the bomb, no one would argue that he would not be guilty of the attempted murder of everyone on the plane.

*Canizales* recognizes that a defendant's intent is to be inferred from circumstantial evidence. (*Canizales*, *supra*, 7 Cal.5th at p. 606.) In fact, intent is always inferred from the circumstances surrounding the crime. A jury cannot peer into a defendant's head and find the intent there. If a person buys a gun and ammunition, walks up to his sworn enemy, points the gun between the enemy's eyes and pulls the trigger while declaring, "I do not intend to kill you," it is the circumstantial evidence from which we infer the person's intent.[5] People lie, circumstances do not. " '[C]ourts and juries every day pass upon knowledge, belief and intent—the state of men's minds—having before them no

---

[5]     "What is the natural expression of an intention?—Look at a cat when it stalks a bird; or a beast when it wants to escape." (L. Wittgenstein, Philosophical Investigations para. 647 (3d ed. G.E.M. Anscombe trans. 1958) p. 165e.)

more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.' " (*United States v. Williams* (2008) 553 U.S. 285, 306 [170 L.Ed.2d 650, 671].)  "The intent or intention is manifested by the circumstances connected with the offense."  (§ 29.2, subd. (a).)

As stated above, *Canizales* held that a jury may not convict under a kill zone theory unless it concludes:  "(1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target; and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.)  *Canizales* held that the use of force that merely endangers everyone in the zone is insufficient to support a kill zone instruction. (*Id*. at p. 608.)  But we should not confuse a defendant's *desire* to cause a person's death with the intent to kill. Defendant may not have desired N.C.'s death, but he is criminally responsible for knowing to a near certainty that anyone in Smith's vicinity would be a victim of defendant's use of lethal force, and for accepting that outcome as the price of ensuring Smith's death.

The relevant circumstances demonstrating an intent to kill under a kill zone theory include the "type and extent of force the defendant used," "the type of weapon used, the number of shots fired . . . , the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target[,]" and whether the attack occurred in an area "from which victims would have limited means of escape." (*Canizales, supra,* 7 Cal.5th at pp. 597, 607, 611.)  Here,  in contrast to *Canizales*, where the defendants fired five bullets from a distance of 100 to 160 feet on a wide city street at targets who were running away, defendant shot 10 times in close proximity to his target, who was on a dance floor with other bar patrons while a strobe light was going off.

Defendant did not take aim at Smith, but fired with his arm in a swooping motion as he moved toward the target. N.C. was in close proximity to Smith, and was in fact hit. Defendant used at least one hollow point bullet, designed to inflict maximum damage. The shooting occurred in a bar, where there was no easy exit.

The trial court instructed the jury that "intent may be proved by circumstantial evidence" and that "before you may rely on circumstantial evidence to conclude that the defendant had the required intent, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent." We presume the jury followed this instruction. (*People v. Ledesma* (2006) 39 Cal.4th 641, 684.) Accordingly, the jury inferred from the circumstances that defendant used sufficient force, the type and extent of which were intended to kill everyone within the immediate area of Smith in order to ensure Smith's death. (See *Canizales*, *supra*, 7 Cal.5th at p. 607.)

*Canizales* teaches that "the kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk.' " (*Canizales*, *supra*, 7 Cal.5th at p. 607.) Here, however, the type and extent of the force used, the distance between defendant and Smith, the distance between Smith and N.C., and the enclosed nature of the bar add up to only one reasonable conclusion, and that conclusion is that defendant intended to kill everyone close to Smith in order to ensure Smith's death. Defendant may not have wanted to kill N.C., but he is charged with knowingly engaging in lethal actions under circumstances in which her death was a near certainty. His actions were more than reckless. On a scale of probability between unlikely and certain, the chances that his actions would kill the people on the dance floor near Smith were sufficiently close to certain that a reasonable jury must conclude he intended to kill everyone in the zone of danger.

Defendant also argues there was insufficient evidence to adequately define the parameters of the "kill zone," and without such defined parameters, the evidence would

only support an inference of implied malice based on a conscious disregard for life—insufficient for attempted murder. We disagree. The only requirement was that the jury find N.C. was located within the zone of harm. (*Canizales, supra,* 7 Cal.5th at p. 597.) There was no requirement that the parameters of the "kill zone" be defined. There was certainly no such requirement here, where the victim of the attempted involuntary manslaughter was, in fact, shot and seriously wounded.

D. "Kill Zone" Jury Instruction

Defendant argues that even if there was sufficient evidence to support a "kill zone" instruction, the instruction did not provide enough guidance for the jury to determine whether a "kill zone" existed and whether he used sufficient force to create such a zone. He argues the language of the instruction deprived him of due process. Defendant argues the instruction was inadequate because it did not direct the jury to decide the scope of the zone and did not direct that the jury must find N.C. was in the zone. Defendant also argues the instruction confused the jury by telling them it could find defendant guilty of murder (or voluntary manslaughter) either if defendant intended to kill people on the dance floor or intended to kill everyone on the dance floor.

The standard "kill zone" instruction given in this case was materially the same as the one given in *Canizales.* The Supreme Court did not reach Canizales's challenge to CALCRIM No. 600 because it concluded the instruction should not have been given on the facts presented. (*Canizales, supra,* 7 Cal.5th at p. 618.) *Canizales* indicated the standard instruction "should be revised to better describe the contours and limits of the kill zone theory . . . ." (*Id*. at p. 609.) The court did not propose language revising the instruction, nor did it indicate it was error to give the standard instruction.

Defendant did not object to the "kill zone" instruction. When the trial court's instruction is a correct statement of the law, defendant's failure to request an amplifying or clarifying instruction bars appellate review. (*People v. Ashmus* (1991) 54 Cal.3d 932, 997, abrogated on other grounds recognized by *People v. Yeoman* (2003) 31 Cal.4th 93,

21

117; *People v. Johnson* (1993) 6 Cal.4th 1, 52, overruled on another ground in *People v. Rogers* (2006) 39 Cal.4th 826, 879.) The trial court gave the standard instruction without material change. " 'The trial court cannot reasonably be expected to attempt to revise or improve accepted and correct jury instructions absent some request from counsel.' " (*People v. Kelly* (1992) 1 Cal.4th 495, 535.)

Defendant's failure to object to the instruction forfeits appellate review. Even if he had not forfeited review of the instruction, we would not reverse. It is a true statement of law that defendant would be guilty of attempted murder (or voluntary manslaughter) if his intent was either to kill people on the dance floor or to kill everyone on the dance floor. In the first instance, there would be no need for a kill zone theory. "[A] person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind." (*People v. Stone, supra,* 46 Cal.4th at p. 140.) This part of the instruction was not confusing. Additionally, the trial court did not need to define the scope of the kill zone in this case, where the person defendant is accused of intending to kill was mere feet from the primary target, and was in fact hit by at least one of defendant's bullets. Also, the court's instruction directed the jury by implication to find that defendant used sufficient force to create a kill zone, when it instructed the jury that defendant must have intended to kill everyone within the kill zone.

II

Prosecutorial Error

Defendant argues the prosecutor engaged in a pattern of misconduct that deprived him of his right to a fair trial.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or

22

the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) A judgment will not be reversed on the ground of prosecutorial misconduct in the absence of prejudice. (*People v. Bolton* (1979) 23 Cal.3d 208, 214.) "Under traditional application of this state's harmless error rule, the test of prejudice is whether it is 'reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the [conduct] attacked by the defendant. [Citations.]' [Citation.] However, if federal constitutional error is involved, then the burden shifts to the state 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' (*Chapman v. California* (1967) 386 U.S. 18, 24, [17 L.Ed.2d 705, 710].)" (*Ibid.*)

"It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal. [Citations.] 'The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice.' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328.) A defendant need not make a timely specific objection if an objection would be futile. (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

Defendant's claims of misconduct can be divided into six categories: (1) failure to investigate and disclose Smith's Los Angeles gang ties; (2) seeking to exclude gang evidence; (3) admitting evidence defendant was in a gang; (4) challenging the defense assertion that Smith considered LaSalle's Bar his turf; (5) not disclosing the full contents of defendant's notebook; and (6) forcing defense counsel to get an order to compel the gang expert from Los Angeles to appear at defendant's retrial.

The prosecution filed a pretrial motion to exclude evidence of gang affiliation by Smith. The prosecution requested that if the defense sought to introduce such evidence, the court would hold an Evidence Code sections 402 and 405 hearing to determine the existence of a preliminary fact. The prosecutor argued there was no evidence the prior

altercation between defendant and Smith had been gang related, defendant had not disclosed a gang expert witness, and gang evidence would be highly inflammatory. Defendant opposed the motion, arguing that a witness had stated the earlier fistfight occurred after defendant walked up to Smith and "started talking Crip" and said something about Smith's blue Los Angeles Dodgers cap. Defendant also pointed out that the statement of probable cause indicated one of Smith's friends reported Smith "had left the gang lifestyle of his youth behind but acknowledged Smith used to be associated with the Crips." Defendant complained that the prosecution had failed to investigate Smith's gang ties. Defendant argued Smith's gang association was highly relevant.

The prosecution provided defense counsel with one document indicating Smith had spent time in the California Youth Authority, but the document gave no details about Smith's commitment offense or criminal background. Defendant brought a motion to compel disclosure of all records regarding criminal activity for each witness to be called at trial. At the hearing on the motion, the prosecution argued its only obligation was to seek out information in the possession of the prosecution team, and that state parole and Los Angeles law enforcement were not within the prosecution team. The prosecutor stated she had checked with the Chico Police Department, which was the investigating agency, and it had come up with no gang connections for Smith. Defendant argued Smith's criminal records were relevant to his claim of self-defense. The trial court granted defendant's request as it related to the victim's prior violent acts as an adult and ordered the prosecutor to provide any information within the custody of the Los Angeles Police Department regarding Smith's membership in or association with the "Harlem 30 Crips" from 2006 to 2011. The order was filed on April 2, 2013, and the prosecutor complied with the order on April 4, 2013.

The trial court granted defendant's motion to continue the trial from April 8, 2013, to May 6, 2013, because of the new information regarding Smith's gang ties. At a May 3, 2013 hearing on motions in limine, the court heard the prosecution's motion to

24

exclude gang evidence. Defendant responded that he wanted to introduce gang evidence to show defendant's reasonable belief in the need for self-defense, to show motive for Smith, and to impeach the credibility of the bar employees. Defense counsel repeatedly complained that he had only had the information about Smith's gang ties for 25 days. Defense counsel stated the prosecutor's failure to discover the information was "almost borderline prosecutor . . . misconduct, if you ask me." The court said it would hear a request for a motion to continue the trial, but defense counsel stated his client wished to proceed with trial. The court ruled gang evidence would be allowed only after a hearing pursuant to Evidence Code sections 402 and 405, and only after defendant established he knew of Smith's gang ties.

The prosecution began its presentation on May 13, 2013, but defendant did not call his first witness until May 20, 2013.

Defendant testified that he was not a gang member, but that he was "in to" hip hop music, and the culture of the music involved gangs. The prosecution sought the court's permission to cross-examine defendant on his association with gangs, his knowledge of gang rules, his tattoos that might be gang-related, and his cap that might have a gang meaning. Defendant did not disagree with the court's ruling to permit cross-examination on those issues.

The prosecutor started to cross-examine defendant on a notebook containing rap/hip-hop lyrics that was found at defendant's residence. Outside the presence of the jury, defense counsel told the court he had been given only eight copied pages of the notebook, and asked the court to exclude the notebook from evidence. The prosecutor responded that one of the detectives had photographed the pages he thought were of evidentiary value, that the prosecution was not required to photograph all of the pages of the notebook, and that she wanted to admit two pages that were not previously given to the defense.

25

The trial court concluded there was fault to be laid on both sides, since the People were required to disclose all statements made by a defendant, but the notebook was an item of evidence to which defendant had access. The court said it would allow defendant time to review the notebook. Later, after defense counsel reviewed the notebook, the court asked if there were additional comments regarding its admissibility. Defense counsel replied that he had no objection to the notebook being admitted.

Defendant presented Stephen Glick, a City of Los Angeles police officer, as a gang expert witness. He testified that Smith was a documented member of the "Rollin' 30 Crips," one of the most violent gangs in Los Angeles. Smith was a member of a subset called the "39th Street Hot Heads," the most violent of the gang. Glick said he had personally come into contact with Smith over eight times, including an arrest for possession of brass knuckles, and an arrest for possession of cocaine for sale. Glick considered Smith a dangerous person. Glick opined that if Smith issued an apology through a third person, it would be more of a threat than an apology. He testified that the Crips and Bloods are extreme rivals. Glick testified that he had examined the lyrics and poems in defendant's notebook, and that nothing in the notebook was typical of Blood membership in the Los Angeles area, nor did he recognize defendant's tattoos as gang tattoos.

The prosecution introduced the testimony of its own gang expert, Butte County Sheriff's Deputy Silver Paley. Deputy Paley opined that "at the very least, [defendant] is a Blood criminal street gang associate."

After the jury was unable to reach a verdict on count 1—attempted murder of Smith—the People sought to retry count 1. Defense counsel obtained a court order to have Glick appear to testify at the retrial, which was a different procedure than defense counsel used for the original trial. Defense counsel was willing to agree to a continuance of the retrial, but indicated the Los Angeles Police Department was giving "a lot [of] push back" about having their detective come up and testify for the defense in a trial out

26

of county. They indicated they would not make Glick available in the future if the retrial did not go forward as scheduled. The People eventually dismissed the retrial of count 1 in the interest of justice.

A. Failure to Investigate and Disclose Smith's Gang Ties in Los Angeles

Assuming defendant preserved his claim of prosecutorial misconduct on this point by commenting that the prosecution's failure to discover Smith's gang ties in Los Angeles County were "almost borderline prosecutor . . . misconduct, if you ask me[,]" and assuming there was error on the part of the prosecutor, the failure did not prejudice defendant.

As set forth in part III below, there was no violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), which requires the prosecution to turn over exculpatory evidence. However, section 1054.1 requires a prosecuting attorney to disclose exculpatory evidence that is "in the possession of the prosecuting attorney [or that] the prosecuting attorney knows . . . to be in the possession of the investigating agencies." The Supreme Court has held that the duty to disclose includes "information in the possession of all agencies (to which the prosecution has access) that are part of the criminal justice system, and not solely information 'in the hands of the prosecutor.' " (*In re Littlefield* (1993) 5 Cal.4th 122, 135.) Thus, the prosecutor arguably had a statutory duty to provide the information to defendant upon request of his counsel.

However, there was no statutory violation. Discovery in criminal cases is governed by sections 1054 through 1054.10. Section 1054.5 provides that these sections are the exclusive means of discovery. Section 1054.1, subdivision (e) provides the prosecuting attorney must disclose any exculpatory evidence that is in the possession of the prosecuting attorney or that the prosecuting attorney knows is in the possession of the investigating agencies. Assuming that information held by a non-investigating agency is encompassed by section 1054.1, section 1054.7 nevertheless provides: "The disclosures required under this chapter shall be made at least 30 days prior to the trial, unless good

27

cause is shown why a disclosure should be denied . . . ." The information from the Los Angeles Police Department, which was the basis of defendant's request that the instruction be given, was provided to defense counsel 32 days before trial. Thus, there was no statutory discovery violation.

Moreover, the court will not reverse the judgment in the absence of prejudice. (*People v. Bolton*, *supra*, 23 Cal.3d at p. 214.) The test of prejudice is whether there is a reasonable probability a result more favorable to the defendant would have occurred in the absence of the error. (*Ibid.*) There is no reasonable probability that the result would have been more favorable to defendant because he received the information within the time mandated by statute. He received the information from the prosecution 32 days before the start of the trial after the court granted his motion for a continuance because of the new information. He received the information 46 days before he presented his case. The trial court indicated it would entertain a motion to continue the trial further, but defendant decided to proceed with the scheduled trial date. The information was presented to the jury. Glick testified that Smith was a dangerous gang member, giving some credence to the theory of self-defense.

Defendant cannot now claim to have been harmed by late disclosure of the evidence.

B. Forfeited Arguments of Prosecutorial Misconduct

Defendant argues the prosecutor committed misconduct by moving to exclude evidence of Smith's gang involvement. He argues that once it became apparent that Smith's gang ties would be admissible, the prosecutor committed misconduct by seeking to establish defendant's gang connections through the testimony of the two gang experts. Defendant wanted to admit the testimony of its gang expert that part of Smith's gang's turf in Los Angeles was LaSalle Street, and make a connection between that and the name of the bar in which the shooting took place, implying that Smith claimed the bar as his turf. The trial court excluded the evidence that the bar was related to the street in Los

Angeles, as well as evidence the bar was involved in drug trafficking because it was speculative. Defendant argues the prosecutor committed misconduct by convincing the trial court to exclude this evidence. Defendant argues it was misconduct for the prosecutor to not provide him with a copy of all of the pages of his notebook, which was seized during the search of his residence. The prosecutor attempted to cross-examine defendant with pages from the notebook, not all of which had been copied for the defense. Defendant also claims the prosecutor committed misconduct because the defense was forced to seek a court order to have Glick, the gang expert from Los Angeles, testify for him in the retrial of count 1.

Defendant did not object to any of this on the ground of prosecutorial misconduct below. Unless an objection on misconduct grounds would have been futile, and there is no indication that would have been the case here, "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) Thus, none of these instances of claimed misconduct have been preserved for appellate review.

Defendant argues his request to inform the jury of the delayed disclosure through CALCRIM No. 306 was sufficient to preserve his prosecutorial misconduct argument for review.[6] We disagree. The request for instruction was neither specifically directed to prosecutorial misconduct, nor timely. (*People v. Samayoa, supra*, 15 Cal.4th at p. 841.)

---

**6** The proposed instruction was: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] An attorney for the People failed to disclose: Evidence of . . . Smith's gang history within the legal time period. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

29

The jury instruction was not a timely objection because it was not proposed until the parties had rested. For the same reason, defendant could not have assumed his timely objections would have been futile, since the trial court had yet to issue any ruling on the jury instruction. Additionally, the jury instruction related only to evidence of Smith's gang history. Of the six instances of misconduct alleged by defendant, only one (analyzed in subsection A, above) related to the late discovery of Smith's gang history.

III

*Brady*

Defendant argues the prosecution's failure to timely discover and turn over exculpatory evidence to the defense was a *Brady* violation. There was no *Brady* violation. *Brady* held that the suppression by the prosecution of material, exculpatory evidence violates due process. (*Brady, supra,* 373 U.S. at p. 87.) However, the prosecution's duty to learn of exculpatory evidence extends only "to evidence the prosecutor—or the prosecution team—knowingly possesses or has the right to possess." (*People v. Superior Court (Barrett)* (2000) 80 Cal.App.4th 1305, 1314-1315; *Kyles v. Whitley* (1995) 514 U.S. 419, 437.) "A prosecutor has a duty to search for and disclose exculpatory evidence if the evidence is possessed by a person or agency that has been used by the prosecutor or the investigating agency to assist the prosecution or the investigating agency in its work." (*People v. Superior Court (Barrett),* at p. 1315.) The Los Angeles Police Department was not an agency used by the prosecutor to assist in the prosecution of defendant, so there was no *Brady* duty to seek out and disclose the information.

Additionally, "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." (*Strickler v. Greene* (1999) 527 U.S. 263, 281.) Here, as indicated, the evidence was not suppressed, but was given to the defendant and was used in his defense. The trial court continued the trial to allow defendant to investigate the

30

evidence, and expressed a willingness to further extend the trial date to accommodate defendant, but defendant refused. Under these circumstances, there is no reasonable probability the evidence would have produced a different verdict had it been disclosed sooner.

IV

Failure to Give CALCRIM No. 306

Defendant argues the trial court abused its discretion when it failed to instruct the jury with CALCRIM No. 306, regarding the prosecution's late disclosure of discovery. Defense counsel argued the instruction was justified because of "the untimely disclosure of Mr. Smith's gang history." Defense counsel argued he had to obtain a continuance to get the information 30 days before trial. Defense counsel argued he was "forced to scramble" to get Officer Glick's testimony before the jury, and that he had not been able to investigate whether LaSalle's Bar was part of Smith's turf. He acknowledged, however, that his expert testified that the bar was "gang central of Chico[,]" but complained he had not been able to fully explore it.

In ruling on the instruction, the trial court stated: "I do not find the evidence was untimely disclosed. It was the proper subject of a motion to compel. That motion to compel was granted, and the evidence was fully presented at trial. [¶] So the Court is denying the request to instruct on untimely disclosure of evidence."

The decision to give an instruction on the untimely disclosure of evidence is within the trial court's discretion. (§ 1054.5, subd. (b); *People v. Lamb* (2006) 136 Cal.App.4th 575, 581.) Here, Glick's testimony was before the jury, as was the information that the bar was "gang central" of Chico. Because there was no statutory discovery violation, the trial court did not abuse its discretion in excluding the instruction.

31

V

Sentencing

The trial court imposed the upper term of nine years for count 3, and the upper term of 10 years for the section 12022.5 personal use of a firearm enhancement. Defendant argues the trial court abused its discretion, and that there was insufficient evidence to support the upper terms.

Defendant forfeited these sentencing claims because he did not object at the time of sentencing. Failure to object forfeits "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices. Included in this category are cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly . . . misweighed the various factors, or failed to . . . give a sufficient number of valid reasons." (*People v. Scott* (1994) 9 Cal.4th 331, 353.) The reasoning behind the rule is that trial counsel is charged with clarifying permissible sentencing choices at the hearing, and "[r]outine defects in the court's statement of reasons are easily prevented and corrected if called to the court's attention." (*Ibid*.)

"[T]he *Scott* rule applies when the trial court 'clearly apprise[s]' the parties 'of the sentence the court intends to impose and the reasons that support any discretionary choices' [citation], and gives the parties a chance to seek 'clarification or change' [citation] by objecting to errors in the sentence. The parties are given an adequate opportunity to seek such clarifications or changes if, at *any time* during the sentencing hearing, the trial court describes the sentence it intends to impose and the reasons for the sentence, and the court thereafter considers the objections of the parties before the actual sentencing. The court need not expressly describe its proposed sentence as 'tentative' so long as it demonstrates a willingness to consider such objections." (*People v. Gonzalez* (2003) 31 Cal.4th 745, 752.)

Prior to sentencing, defense counsel argued the trial court should grant probation, or in the alternative follow the recommendation of probation and impose the middle term. The prosecutor argued for the upper term.

In imposing the upper terms the court stated in pertinent part:

"[T]he crime involved great violence and other acts disclosing a high degree of cruelty, viciousness, or callousness.

"In this case [N.C.] was struck by two separate bullets, one of which was lodged in the grommet in her jeans and the other into her shoulder. The manner in which the crime was accomplished included planning, sophistication, and professionalism.

"As noted by counsel, defendant secreted a weapon on his person and made it past the bouncers . . . . He selected a position of advantage on a raised platform in the back of the bar where all of the exits on the back patio area were visible as well as any people entering into that area would be visible.

"Defendant engaged in conduct that indicates a serious danger to society. He fired a weapon toward a crowded dance floor. [¶] . . . [¶]

"With regards to the Penal Code 12022.5, personal use of a firearm in the commission of a felony, the Court is selecting the upper term of the 3, 4, 10-year triad for the following reasons:

"The defendant was armed with a weapon, he pointed the weapon towards people, he fired the weapon towards people, and he fired the weapon multiple times towards people. The defendant's conduct was exceptionally dangerous under the circumstances, and it appears that the upper term for that triad is appropriate."

After the trial court ordered the appropriate fines and credits, and notified defendant of his right to appeal, it asked: "Are there any other issues, Counsel?" Defense counsel replied, "No, your Honor."

The forfeiture rule applies when the trial court sets forth the sentence it intends to impose and the reasons supporting its discretionary choices and gives the parties a chance to object to any errors in the sentence. (*People v. Sperling* (2017) 12 Cal.App.5th 1094,

33

1101.)  The rule is inapplicable only if the trial court fails to give the parties an opportunity to object.  As set forth above, the trial court gave the parties an opportunity to object to the sentence.

Even if the issue were not forfeited, there is no sentencing error.  We will not set aside the trial court's discretionary sentencing determination absent a clear showing by the defendant that the court's sentencing decision was an abuse of discretion.  (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)  A trial court abuses its discretion "if it relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision."  (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)  However, a single valid aggravating factor is enough to justify a sentencing choice.  (*People v. Yim* (2007) 152 Cal.App.4th 366, 369.)

Defendant argues the aggravating factors relied upon by the trial court to support the upper term for the assault conviction were unsupported by the record.  The factors cited by the trial court were:  "The crime involved great violence, great bodily harm, . . . or other acts disclosing a high degree of cruelty, viciousness, or callousness" (Cal. Rules of Court, rule 4.421(a)(1)); "[t]he manner in which the crime was carried out indicates planning, sophistication, or professionalism" (Cal. Rules of Court, rule 4.421(a)(8)); and "[t]he defendant has engaged in violent conduct that indicates a serious danger to society" (Cal. Rules of Court, rule 4.421(b)(1)).  There was sufficient evidence to support all these findings.

A violation of section 245, subdivision (b) does not require that any injury result (*People v. White* (2015) 241 Cal.App.4th 881, 884), and it may be committed without the firearm having been fired (see *People v. Fain* (1983) 34 Cal.3d 350, 356-357).  Defendant actually hit N.C. twice, and fired 10 rounds.  She suffered great bodily harm, and there was great violence against her.  Defendant brought a gun to a bar, and began shooting from a position of advantage where he could see the entrances and exits, which was sufficient evidence of planning.  It should go without saying that defendant posed a

serious danger to society by bringing a gun that was loaded with at least one hollow point bullet to a bar and shooting into a group of people at the bar, unloading the clip.

Defendant also argues the trial court abused its discretion when it failed to consider certain mitigating factors. A trial court may disregard mitigating factors without stating its reasons. (*People v. Lai* (2006) 138 Cal.App.4th 1227, 1258.) There was no abuse of discretion.

The aggravating factor relied upon by the court to impose the upper term on the section 12022.5 enhancement was the fact that defendant fired the gun multiple times toward a group of people. An aggravating factor is one that exists beyond that which would result from mere use of the gun itself. (*People v. Douglas* (1995) 36 Cal.App.4th 1681, 1691.) Multiple shots and multiple targets suffice to justify the upper term because a defendant need not shoot a gun multiple times toward multiple victims for the enhancement to be true.

VI

Cumulative Error

Defendant argues cumulative error rendered his trial "fundamentally unfair." Taking all of his claims into account, we are satisfied he received a fair adjudication. His trial was fair beyond a reasonable doubt.

VII

Senate Bill No. 620

Defendant filed a supplemental brief following the passage of Senate Bill No. 620, which amended section 12022.5 as follows: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (§ 12022.5, subd. (c).) Defendant argues and the People concede that Senate Bill No. 620 is retroactive and applies to this case.

However, we are not persuaded by the People's claim that we should not remand in this case because "the record shows that the sentencing court clearly indicated that it would not, in any event, have exercised its discretion to strike the allegations." (*People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896.) The People contend the trial court's decision to impose the upper term on both the substantive charge and the firearm enhancement indicate there is no reasonable probability the trial court would have stricken the firearm enhancement, or will strike it on remand. The argument is not persuasive. The fact that the trial court elected the upper term does not necessarily indicate it would not elect to strike the firearm enhancement if given the opportunity. The trial court did not indicate that even if it had discretion to strike the weapon enhancement it would not do so. The trial court's only comment in imposing the upper term for the enhancement was: "The defendant was armed with a weapon, he pointed the weapon towards people, he fired the weapon towards people, and he fired the weapon multiple times towards people. The defendant's conduct was exceptionally dangerous under the circumstances, and it appears that the upper term for than triad is appropriate." This comment does not "clearly indicate" that the trial court would not have exercised its discretion to strike the enhancement, had it understood it had the power to do so. We express no opinion as to how the trial court should exercise its discretion on remand.

## DISPOSITION

The matter is remanded to the trial court to exercise its newly bestowed discretion regarding whether to strike the sentencing enhancement imposed pursuant to section 12022.5, subdivision (a).  In all other respects, the judgment is affirmed.


                                        /s/
                                        BLEASE, Acting P. J.


We concur:


        /s/
HULL, J.


        /s/
HOCH, J.

37